KENNEDY HODGES, LLP
Don Foty (TX Bar No. 24050022) (Admitted *pro hac vice*)
Galvin Kennedy (TX Bar No. 00796870) (Admitted *pro hac vice*)
4409 Montrose Blvd, Suite 200
Houston, Texas 77006
Phone: (713) 523-0001; Fax: (713) 523-1116
Email: dfoty@kennedyhodges.com
        gkennedy@kennedyhodges.com
Counsel for Plaintiff and the Class

Mark D. Kemple (SBN 145219) (kemplem@gtlaw.com)
Adil M. Khan (SBN 254039) (khanad@gtlaw.com)
GREENBERG TRAURIG, LLP
1840 Century Park East, Suite 1900
Los Angeles, California 90067-2121
Telephone: (310) 586-7700 / Facsimile: (310) 586-7800

Jeffrey Morganroth (*Admitted Pro Hac Vice*) (JMorganroth@morganrothlaw.com)
MORGANROTH AND MORGANROTH PLLC
344 N. Old Woodward Avenue, Suite 200
Birmingham, MI 48009
Telephone: (248) 864-4000 / Facsimile: (248) 864-4001
Attorneys for Defendant Amrock Inc. (f/k/a Title Source, Inc.)

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **SOM SWAMY, on Behalf of Himself and on Behalf of All Others Similarly Situated,** | § Case No.: 3:17-cv-01175-WHA<br>§<br>§ **CLASS AND COLLECTIVE ACTION**<br>§ |
| **Plaintiff,** | § |
| **V.** | § **JOINT MOTION FOR PRELIMINARY**<br>§ **APPROVAL OF CLASS ACTION** |
| **TITLE SOURCE, INCORPORATED,** | § **SETTLEMENT**<br>§ |
| | § |
| **Defendant.** | § **Hearing Date:  May 31, 2018**<br>§ **Time:        8:00  a.m.**<br>§ **Courtroom:    8**<br>§ **Judge:       Hon. William H. Alsup**<br>§ |

## NOTICE OF MOTION

PLEASE TAKE NOTICE that on May 31, 2018, at 8:00 a.m., or as soon thereafter as the

matter may be heard, in Courtroom 8, Twelfth Floor, before the Honorable William H. Alsup,

Plaintiff Som Swamy ("Plaintiff") will move this Court for an Order: (1) preliminarily approving

a proposed settlement of this action (the "Settlement") and staying all other activity in this action; (2) approving the form and manner of giving notice to the Class ("Notice"); (3) approving the parties' agreed-upon deadlines for class members to exercise their rights in connection with the proposed Settlement; and (4) scheduling a hearing before the Court to determine whether the proposed Settlement and Plaintiff's Fees and Costs Application and Service Award Application (as defined below) should be given final approval ("Preliminary Approval Order"). The proposed Settlement creates fund of six hundred thousand dollars ($600,000) (not to be diminished by any Fees or Costs Award) to be paid by Defendant Title Source, Inc., now known as Amrock ("TSI," "Amrock" or "Defendant"), for the benefit of the Settlement Class (as defined below). If approved, the proposed Settlement would resolve all of the claims that the Court has certified for class treatment.

The grounds for this Motion are that: (1) the proposed Settlement is fair, reasonable, and adequate such that Notice should be disseminated to members of the certified Class; and (2) the proposed Notice adequately apprises Class Members about the terms of the Settlement and their rights with respect to it.

This motion is based on the Memorandum of Points and Authorities submitted below, the accompanying Declaration of Don Foty ("Foty Declaration"), the accompanying declaration of David Breshears (the "Breshears Declaration"), the accompanying Class Settlement Agreement and Release (the "Settlement Agreement") dated May 17, 2018, the concurrently filed compendium of evidence, and all other pleadings and matters of record.

Respectfully submitted,

Dated: May 21, 2018              KENNEDY HODGES, LLP


By: ____/s/ Don Foty_____
    Don Foty
    Attorneys for Plaintiff and the Class


Dated: May 21, 2018              GREENBERG TRAURIG, LLP

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

By:   _/s/ Mark Kemple_
Mark D. Kemple Attorneys for
Defendant Amrock Inc. (f/k/a Title
Source, Inc.)

JOINT MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT

1

## I.    INTRODUCTION

The parties jointly submit this motion for preliminary approval of the proposed classwide settlement, that allocates $600,000 to Class Members proportionally based on their dates of employment, and class counsel's and Plaintiff's expert's estimate of the number of miles they are projected to have driven each year during the class period. It includes no claims procedure, and no reversion to the defendant for uncashed checks issued to class members.  A copy of the Settlement Agreement is attached as Exhibit 1 to the Foty Declaration. The parties seek: (1) preliminary approval of the terms of the Settlement and a stay of all non-settlement related activity in the Action; (2) approval of the Notice of the proposed Settlement to be mailed to Class Members: (3) approval of the parties' agreed-upon deadlines for class members to exercise their rights in connection with the proposed Settlement; and (4) entry of a Preliminary Approval Order setting a Final Approval Hearing and directing Notice to the Class.

The Parties believe that this is a generous settlement because the class certified by the Court is receiving substantial benefit.  While the parties have different views on the potential exposure posed by the certified claims, discussed in part herein, the settlement recovery to the Class represents approximately 64% of the class damages calculated by Plaintiff, and represents several multiples of the maximum potential class damages as calculated by Amrock should a class ultimately prove to be manageable and should plaintiff prevail on a classwide basis on all claims.  Under Plaintiff's damage model, if Plaintiff prevailed on all of the class claims, the Class Members would be owed: (1) $692,342.81 for their vehicle expense reimbursement claim, (2) $71,859.60 for their home Internet expense reimbursement claim, (3) $43,775 for their cell phone expense reimbursement claim, and (4) $124,150 for their invalid wage statement claim. This yields total class damages of $932,127.41 under Plaintiff's model. (*See* Exhibit "2" – Declaration of David Breshears).  As described herein, Amrock estimates the amount in controversy to be only $92,000 for all certified claims.

Under the Parties' proposed settlement, each Class Member who does not properly opt-out will receive a settlement award that corresponds to his/her dates of employment (for the wage statement, phone expense, and internet expense claims) and an estimate of the number of

miles driven for inspections (using a formula proposed by Plaintiff's expert). Attached hereto as Exhibit "2" is the Declaration of David Breshears who has calculated the class damages using Plaintiff's proposed methodology (Amrock expressly reserves the right to challenge this methodology, which it believes vastly overstates the value of the alleged claims, should the settlement not receive Court approval).

If approved by the Court, each Class Member will receive their proportionate share of the Class Settlement Fund. That is, hypothetically, if a putative class Member is owed $2,000 under Plaintiff's class damage model and the total settlement amount is $100,000, his proportionate share of the settlement would be two percent (2%).

The Settlement complies with the guidelines articulated in the Court's "Notice Regarding Factors to be Evaluated for Any Proposed Class Settlement" and *Kakani v. Oracle Corp.*, No. C-06-06493-WHA, 2007 WL 1793774 (N.D. Cal. June 19, 2007), and the fairness criteria set forth by this Court: (1) the settlement only covers those individuals who fall within the Court's class certification order; (2) the release narrowly covers only those claims that were certified for class treatment (Specifically, the release is limited to those claims certified for class treatment: (1) violation of California Labor Code § 2802, (2) violation of California Labor Code § 226, and (3) a derivative violation of California Business & Professions Code §§ 17200, *et seq.* (through violation of California Labor Code § 2802 and/or California Labor Code § 226). *See* Docket 154.); (3) Class counsel must separately move for an award of attorneys' fees and litigation costs, which will not reduce the class members' recovery; (4) the parties have not agreed to any limit on a potential fee award or litigation costs award, with Amrock retaining all rights to oppose Class Counsel's request; (5) putative class members can easily opt out; (6) there is no claims process to receive a payment, and (7) there is no reversion to Amrock of monies allocated to participating Class Members.

While Class Counsel intends to later file Plaintiff's Fees and Costs Application and Service Award Application, the Settlement does not depend on any fees or costs being awarded, and such additional amounts will be paid by Amrock directly and will not diminish the amount paid to the Class. Further, all Class Members who do not timely opt-out will receive a payment.

Furthermore, the parties reached a settlement following arm's-length negotiations with an experienced mediator, David A. Rotman, who was forced to make a mediator's proposal to reach a deal that was ultimately accepted by both sides.

Therefore, the Parties believe that the Settlement is fair, reasonable, and adequate and therefore the Preliminary Approval Order should be entered and Notice disseminated to Class Members.

## II.    BACKGROUND

On March 7, 2017, Plaintiff Swamy filed this action alleging that Amrock (1) misclassified him as exempt from overtime, (2) failed to reimburse him for all reasonable and necessary vehicle, cell phone, and home Internet expenses, (3) provided to him invalid wage statements, and (4) a derivative violation of California Business & Professions Code §§ 17200, *et seq.* (through violation of California Labor Code § 2802 and/or California Labor Code § 226). (*See* Doc. 1.).  Plaintiff sought to bring this lawsuit as a collective action under the Fair Labor Standards Act, 29 U.S.C. § 201, et seq. and as a Rule 23 Class Action under the California Labor Code. *Id*. Plaintiff sought damages on his behalf and on behalf of the putative class. *Id*.

Since the inception of this case, the Parties have engaged in extensive merits-based and class discovery. Both Parties served initial disclosures, document requests and interrogatories. Specifically, (i) the parties have conducted 11 depositions across 3 states, (ii) Plaintiff has propounded 27 interrogatories, 32 requests for admission, and 70 requests for production, and produced approximately 2,000 pages of records; and (iii) Amrock has propounded 51 requests for production and 12 interrogatories and produced over 52,000 pages of documents, which includes both traditional and electronic discovery. (Foty Decl., ¶ 3.)   In advance of the mediation, Amrock also produced anonymized information for the entire class, which Plaintiff's expert (David Breshears) analyzed to estimate potential recoveries on the certified claims using Plaintiff's proposed methodology.  The parties also engaged and deposed experts:  Plaintiff's damages expert, David Breshears (a certified public accountant in California), and Amrock's appraisal industry expert, Trevor Phillips.

JOINT MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT

On January 18, 2018, Plaintiff filed his Motion for Class Certification under Rule 23 and a renewed Motion for Conditional Certification under the FLSA. (Doc. 109 and 110). In response, the Court certified the following class under Rule 23: "All persons employed by Title Source [now Amrock] as an External Staff Appraiser in California at any time from March 7, 2013, through the present [April 2, 2018]." (Doc. 154 at page 15). The Court ruled that the class could proceed with respect to a subset of Plaintiff's claims but declined to certify a class with respect to Plaintiff's overtime claims under California law or an FLSA collective action.

The Parties then submitted their joint class notice plan and requested the opportunity to engage in settlement discussions. (Doc. 155 and 157). The Court granted the Parties' class notice plan and extended the current pre-trial deadlines. (Doc. 156 and 158).

## III.    SETTLEMENT

On May 4, 2018, the Parties participated in an all-day mediation session with David Rotman, a mediator with extensive experience in class action matters. Mr. Rotman played an active role in the settlement negotiations, including by identifying each side's strengths, weaknesses, and risks. Mr. Rotman also had the benefit of detailed briefs, dozens of exhibits (including mathematical modeling and deposition excerpts), and hours of in-person discussions with the parties and their counsel. This process culminated in Mr. Rotman making a neutral and informed mediator's proposal, which both sides accepted.

The Settlement provides for substantial monetary relief to the Class Members. The Settlement allocates \$600,000[1] to the putative class members proportionally based on the amount each is due under Plaintiff's proposed class damage model. The allocation percentages are identified in the Settlement Agreement as Exhibit "A" to Settlement Agreement.

There will be no claims process because the Claims Administrator will process checks for everyone who does not properly request to be excluded. There is also no option for either

---

[1] The Parties have agreed that Claims Administrator's costs will come out of the settlement fund. This charge will be no more than \$7,000 or approximately 1.2% of the total amount awarded to the Class. Additionally, the Parties have agreed that any incentive award approved by the Court for Plaintiff Swamy will be deducted from the class settlement fund. However, in the event the Court denies either request, the Parties have agreed that the amounts not approved will reallocated to the Class Members.

Plaintiff or Amrock to invalidate the settlement based upon the number of individuals who opt-out.

In consideration for the above relief, the Class Members will release only those claims certified by the Court for class treatment:  "any and all claims. . . for (1) violation of California Labor Code § 2802, (2) violation of California Labor Code § 226, and/or (3) a derivative violation of California Business & Professions Code §§ 17200, *et seq.* through violation of California Labor Code § 2802 and/or California Labor Code § 226, involving any conduct by any Released Party prior to the date of preliminary approval by the Court of this Settlement Agreement."

To the extent that any checks are returned as undeliverable, the Claims Administrator is directed to deposit the settlement funds for the Class Member in the unclaimed funds division in California for the benefit of that Class Member.

The Settlement Agreement also contemplates that Class Counsel will move the Court for an award of reasonable attorneys' fees and expenses ("Fees and Costs Application") incurred in pursuit of the class claims, as well as an incentive award for Plaintiff (not to exceed $7,500). Amrock retains the right to oppose the request for attorneys' fees and expenses.  While the incentive award will be deducted from the $600,000 settlement fund, any award of attorneys' fees and expenses will be separately paid for by Amrock, without any impact on any Class Member's recovery.

## IV.    THE COURT SHOULD PRELIMINARILY APPROVE THE SETTLEMENT

Approval of a proposed class settlement is within the broad authority of the district court. *See Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1025 (9th Cir. 1998); *City P'ship Co. v. Atlantic Acquisition Ltd. P'ship*, 100 F.3d 1041, 1044 (1st Cir. 1996) ("Great deference is given to the trial court [regarding its decision to approve a class action settlement]."). The district 'court's decision, however, is "restrained by 'the clear policy in favor of encouraging settlements.'" *Durrett v. Housing Auth. of Providence*, 896 F.2d 600, 604 (1st Cir. 1990) (citation omitted). Indeed, "there is a strong judicial policy that favors settlements, particularly where complex class

action litigation is concerned." *Allen v. Bedolla*, 787 F.3d 1218, 1223 (9th Cir. 2015) (citation omitted).

"A district court may approve a proposed settlement in a class action only if the compromise is fundamentally fair, adequate, and reasonable." *In re Heritage Bond Litig.*, 546 F.3d 667, 674-75 (9th Cir. 2008) (citing Fed. R. Civ. P. 23(e)). In determining whether a proposed settlement should be preliminarily approved, the court considers both procedural and substantive factors:

> As noted in the Manual for Complex Litigation, Second, [sic] "[i]f the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class, and falls within the range of possible approval, then the court should direct that the notice be given to the class members of a formal fairness hearing * * *." Manual for Complex Litigation, Second §30.44 (1985). In addition, "[t]he court may find that the settlement proposal contains some merit, is within the range of reasonableness required for a settlement offer, or is presumptively valid.' Newberg on Class Actions §11.25 (1992)."

*In re Portal Software, Inc. Sec. Litig.*, No. C-03-5138 VRW, 2007 WL 1991529, at *5 (N.D. Cal. June 30, 2007) (quoting *Schwartz v. Dallas Cowboys Football Club Ltd.*, 157 F. Supp. 2d 561, 570 n.12 (E.D. Pa. 2001)).

Under these criteria, Plaintiff respectfully submits that preliminary approval of the proposed Settlement should be granted and dissemination of the Notice should be ordered.

## A. The Settlement Agreement Resulted from Arm's-Length Negotiations and Is Not the Product of Collusion.

The Court should look to whether the proposed settlement appears to be the product of collusion among the negotiating parties. *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 458 (9th Cir. 2000), as amended (June 19, 2000). In applying this factor, courts give substantial weight to the experience of the attorneys who prosecuted the case and negotiated the settlement. *See In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1080 (N.D. Cal. 2007); *see also Hanlon*, 150 F.3d at 1027 (courts are deferential "to the private consensual decisions of the parties.") (citing *Officers for Justice v. Civil Serv. Comm 'n.*, 688 F.2d 615, 625 (9th Cir. 1982)). Indeed, when a settlement is negotiated at 'arm's-length by experienced counsel, there is a

presumption that it is fair and reasonable. *See Tableware*, 484 F. Supp. 2d at 1080; *City P'ship*, 100 F.3d at 1043 ("When sufficient discovery has been provided and the parties have bargained at arm's-length, there is a presumption in favor of the settlement.").

To that end, the courts have recognized "[t]he assistance of an experienced mediator in the settlement process confirms that the settlement is non-collusive." *Satchell v. Fed. Express Corp.*, No. C03-cv-2659 SI, 2007 WL 1114010, at *4 (N.D. Cal. Apr. 13, 2007); *In re Immune Response Sec. Litig.*, 497 F. Supp. 2d 1166, 1171 (S.D. Cal. 2007.

Here, both sides heeded the Court's advice that "it is better to develop and to present a proposed compromise *after* class certification, *after* diligent discovery on the merits, and *after* the damage study has been finalized." (ECF No. 27 ("Notice Regarding Factors to Be Evaluated For Any Proposed Class Settlement"), § 10 (emphasis in original).) Specifically, the Parties did not exchange any settlement demands until after the Court ruled on motions to dismiss, two motions for conditional certification under the FLSA, Plaintiff's motion for class certification under Rule 23, and two experts were deposed. By that point in time, the record had been well-developed through fact and expert discovery. (*See* Section III, *supra*.)

The proposed Settlement here is the product of extensive, arm's-length negotiations, which included an all-day mediation session with David Rotman -- a private mediator experienced in class action matters, which commenced only after the Parties had the benefit of the Court's Class Certification rulings. (Foty Decl., ¶ 3.) Counsel were thus able to make informed assessments regarding the merits of their claims and defenses. *See In re Charles Schwab Corp. Sec. Litig.*, No. C 08-01510 WHA, 2011 WL 1481424, at *5 (N.D. Cal. Apr. 19, 2011) ("the class settlements were reached on the eve of trial when class counsel had completed discovery and had conducted extensive motion practice and were thus well aware of the issues and attendant risks involved in going to trial as well as the adequacy of the amount of the class settlement."). The negotiations were informed by the knowledge Class Counsel gained through discovery, with the aid of a certified public accountant who calculated an estimate of the amounts owed, as well as the rulings in this litigation. Based on their familiarity with the factual

JOINT MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT

and legal issues, and armed with a thorough understanding of the strength and weaknesses of the claims at issue, the Parties were able to negotiate a fair settlement, taking into account the costs and risks of continued litigation. The negotiations were at all times hard-fought and have produced a result that the Parties believe to be in their respective interests. (Foty Decl., ¶ 3.) In fact, when it appeared that the Parties were unable to reach an agreement, Mr. Rotman made a mediator's proposal, which both sides accepted. (Foty Decl., ¶ 3.); *see also Zynga, Inc.*, 2015 WL 6471171, at *9 ("The use of a mediator and the presence of discovery 'support the conclusion that the Plaintiff was appropriately informed in negotiating a settlement.'").

Class Counsel have carefully evaluated the merits of their case, concluding that they have a strong case and that there is sufficient evidence to proceed to the jury. Class Counsel, however, recognize that there exist challenges in this litigation that could pose significant risks regarding their ability to prevail and the scope of damages if the case were to proceed to trial, and thereafter, an appeal before the Ninth Circuit.[2]  Even if Plaintiff emerged victorious after appeal, there can be no doubt that the appeal would be lengthy and costly for all sides. *Charles Schwab Corp. Sec. Litig.*, 2011 WL 1481424, *5 (approving settlement; "prosecuting these claims through trial and subsequent appeals would have involved significant risk, expense, and delay to any potential recovery"). As such, Class Counsel believes the Settlement is fair, reasonable and adequate, and in the best interest of the Class. (*See* Foty Declaration). *See*, *e.g.*, *In re NVIDIA Corp. Derivative Litig.*, No. C-06-06110-SBA (JCS), 2008 WL 5382544, at *4 (N.D. Cal. Dec. 22, 2008) ("[S]ignificant weight should be attributed to counsel's belief that settlement is in the

---

[2] Defendant has argued that its wage statements comply with California law and this is a hotly disputed liability issue in this litigation, and argues that Plaintiff would not prevail on the merits of any of his claims. Additionally, Defendant claims that Plaintiff's damage model is inflated. Defendant has argued that any miles driven from the Class Member's home to the first inspection site and from the last inspection site back home should be excluded from the damages calculation. Doing so would greatly reduce the potential damages that are owed. Likewise, Defendant claims that an appropriate discount must be given for the personal use of the Class Member's home Internet and cell phones. While Plaintiff disagrees, and believes his model is accurate, if Defendant were to prevail, the potential damages that could be awarded would be significantly reduced. A more thorough recitation of Defendant's arguments is provided in Section B(2) below.

best interest of those affected by the settlement."); *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1043 (N.D. Cal. 2008) (counsel's recommendation weighed in favor of settlement, given counsel's familiarity with the dispute and significant experience in securities litigation).

**B.    The Settlement Has No Obvious Deficiencies and Falls Well Within the Range for Approval.**

When evaluating the adequacy of a settlement, courts balance a plaintiff's expected recovery against the value of the offer. *Tableware*, 484 F. Supp. 2d at 1080; *Portal Software*, 2007 WL 1991529, at *6. This case involves a range of disputed issues including the merits of Plaintiff's expense reimbursement claims and the merits of Plaintiff's wage statement claim. While Plaintiff believes that the Class has meritorious claims, Amrock denies, and continues to deny, each and all of the claims and contentions asserted by Plaintiff.  Likewise, Amrock disputes Plaintiff's damages calculation.

The Parties' settlement is fair and reasonable.  The settlement provides a recovery that is approximately 64% of the Class damages calculated by Plaintiff.  However, under Amrock's Class damage model, the recovery represents approximately 632% of the potential damages that are owed.

**1.    Plaintiff's Evaluation of the Certified Claims (Amrock Does Not Join in this Section of the Brief)**

The proposed Settlement Agreement is also fair to the Plaintiff and Class Members because it provides for a Settlement based upon the actual data in Amrock's possession, including the dates of employment and home inspection data for each Class Member for each week worked during the class period.  Amrock produced the dates of employment and its appraisal data for the entire Class.  Class Counsel's expert then analyzed the data to determine the amounts that he believes are owed to each Class Member using the methodology identified in his report and deposition. (*See* Exhibit "2" and Exhibit "3," Declaration of David Breshears and Deposition of David Breshears, respectively).

Moreover, the settlement allows each Class Member to receive an amount from the settlement fund that is based upon each individual's proportionate share of the total damages

available to all Class Members in the aggregate.  That is, hypothetically, if a Class Member is allocated $2,000 and the total settlement amount is $100,000, his proportionate share of the settlement would be two percent (2%) and he would receive that percentage of the settlement proceeds unless he opts out. The pro rata allocation to each Class Member is set forth on Exhibit A to the Settlement Agreement.

Ultimately, the settlement provides an excellent result for the Class, particularly considering the risk of no recovery if Plaintiff and the Class were unsuccessful through trial and appeal.

Nevertheless, the following provides a further explanation of the merits of the certified class claims for the Court's benefit.

### i.    The Class Members incurred work related expenses for Amrock without reimbursement.

California Labor Code § 2802 requires employers to indemnify their employees for all work-related expenses incurred by the employees in direct consequence of their duties or pursuant to the direction of their employers. *Tan v. GrubHub*, 171 F. Supp. 3d 998 (N.D. Cal. 2016).  The employer's duty to indemnify its employees for these work-related expenses does not turn on whether the employee made a request for a reimbursement, but rather, on whether the employer knew or had reason to know that the employee incurred a reasonable expense; if it did, the employer must exercise due diligence to ensure that the employee was reimbursed. *Stuart v. RadioSchack Corp.*, 641 F. Supp. 2d 901 (N.D. Cal. 2009).

Plaintiff contends that Amrock required the Class Members to use their personal vehicles, home internet connection, and personal cell phones for work.  First, the Job Description for the Staff Appraiser position specifically states that a cell phone is required to work for Amrock. (Doc. 112-14).  However, prior to May of 2015, Amrock did not reimburse the Class Members for use of their personal cell phones for work.  Only after that time did Amrock begin offering a monthly cell phone payment of $85.[3]

---

[3] This claim is limited to the time period prior to May 2015.

Similarly, Plaintiff contends that Internet access at home is a requirement to work for Amrock. The Job Description for Amrock specifically states that a "Home Office setup" with "internet access" is required to work for Amrock.  Plaintiff contends that Internet access at home is needed to communicate with Amrock's MAC portal to submit completed appraisal reports, email their supervisors, and receive job assignments. (Doc. 112-3 at page 161, ln. 17 – 162, ln. 15).  Amrock did not reimburse any Class Member for using the Internet at home. (*Id*. at page 163, lns. 2-7).

Moreover, Plaintiff contends that the Class Members were required to have a driver's license and their own transportation to work for Amrock. (*See* Doc. 112-14).  Amrock's CEO testified that Class Members need transportation "to get to the properties and visit the comparable sales to perform their function." (Doc. 112-3 at page 170, ln. 24 – page 171, ln. 8).  Plaintiff contends that the Class Members had to drive as part of the appraisal process.  They "drive to homes to conduct inspections." (*Id*. at page 171, lns. 3-5).  They "drive to other comparable properties to take pictures." (*Id*. at page 171, lns. 6-8).  Unfortunately, Plaintiff contends that the Class Members do not get reimbursed for the expenses incurred for driving for Amrock. (Doc. 112-5 at page 211, ln. 19 – 212, ln. 16).

Plaintiff contends that the internal documents maintained by Amrock - the job description, job posting, and compensation plans – along with the deposition testimony of Amrock's employees proved that the Class Members were required to use their cell phone, home Internet connection, and personal vehicles for work.  With the exception of cell phone use (which Amrock began to provide a reimbursement after May 2015), Amrock did not provide a reimbursement for these work-related expenses.

Plaintiff firmly believes in the merits of his case because the Class Members did incur these expenses, Amrock had reason to know that they incurred these expenses, and Amrock did not reimburse them.

JOINT MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT

ii.     *Plaintiff Contends that the wage statements issued by Amrock failed to comply with the California Labor Code.*

Employers must furnish accurate wage statements to employees, or else pay a penalty to the employee. Cal. Labor Code § 226(a).  Plaintiff contends that the wage statements issued by Amrock failed to comply with the law. *See* Cal. Labor Code § 226(a) (requiring "an accurate itemized statement in writing showing (1) gross wages earned, (2) total hours worked by the employee, except as provided in subdivision (j), (3) the number of piece-rate units earned and any applicable piece rate if the employee is paid on a piece-rate basis.")

 First, Amrock did not issue one wage statement that identified the gross wages earned because Amrock's policy was to provide two wage statements, rather than one.   Amrock issued two wage statements, one for the salary compensation and the other for the production compensation incentive. (Doc. 112-3 at page 251, lns. 9-18).  As a result, Plaintiff contends that the wage statements for the same pay period had inconsistent and inaccurate information as to the gross wages earned. (*See* Doc. 112-16 at page TSI 601 identifying year to date gross wages as "$18,707.28" on pay date March 6, 2015 when TSI 602 identified year to date gross wages as "$17,622.28" on the same pay date of March 6, 2015).

Second, Plaintiff contends that the hours category was not accurate.  The wage statement for the salary portion of the pay listed 80 hours on nearly every record. (Doc. 112-3 at page 251, ln. 19 – 252, ln. 6; page 253, lns. 1-25).  Yet, Amrock admittedly did not keep track of the hours worked by the Class Members.  Worse, on the wage statement for the production compensation incentive, the number of hours listed is zero. (*See* 112-16 at page TSI 601 identifying 0 hours worked during the pay period of 2/16/2015 – 3/1/2015 and page TSI 602 listing 80 hours worked during the same pay period).  Plaintiff contends that it cannot be reasonably disputed that these wage statements are not accurate.

Third, the wage statement for the production compensation incentive did not provide any information to determine how those wages were calculated.  The production compensation incentive pay was directly tied to the number of appraisals that were completed per pay period. The more appraisals completed meant more points awarded.  More points, meant more money.

JOINT MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT

Plaintiff contends that, under California law, the production compensation incentive constitutes a piece as a matter of law.  The California Department of Industrial Relations identifies piece-rate as "[w]ork paid for according to the number of units turned out."  Here, the number of appraisals that were completed determined the amount of the production compensation incentive pay.

Plaintiff contends that the wage statements did not comply with the law because there was no information as to the number of appraisals completed during the pay period, the number of appraisal points earned during the pay period, or the dollar value associated with each completed appraisal – as required under Cal. Labor Code § 226(a)(3). (*See* Doc. 112-3 at page 254, ln. 4 – 255, ln. 14).  Thus, according to Plaintiff, these wage statements, which were the same for all Class Members, failed to comply with California law.

> iii.    ***Plaintiff contends that the Class Members, including Plaintiff, were not exempt from overtime and thus, Amrock violated the law by not including their hours worked on the wage statements.***

An employer is not required to record the number of hours worked on the wage statements for those employees who are exempt from overtime.  Thus, the question as to whether the Class Members were exempt from overtime is relevant to the determination of their wage statement claim.  Plaintiff contends that this exemption issue can be resolved by answering one question -  whether the completion of appraisal reports constitutes work that is exempt from the overtime requirements.  Plaintiff believes that, in *McKeen-Chaplin v. Provident Savings Bank*, 862 F.3d 847 (9th Cir. 2017), the Ninth Circuit addressed a very similar question and held that this type of work does not constitute exempt work.

*McKeen-Chaplin* involved a class of mortgage underwrites who brought an overtime claim alleging that they were misclassified as exempt from overtime under the administrative exemption. *Id*. at 850-51.  The Ninth Circuit held that the plaintiffs were not exempt because the mortgage underwriters "were not administrators or corporate executives; their tasks are related to the production side of the enterprise." *Id*. at 855.  The Ninth Circuit determined that the plaintiffs' primary job duty, which was analyzing customers' mortgage loan applications and determining their creditworthiness in order to decide whether the bank-employer would approve

the loan, did not relate to the bank's management or general business operations. *Id*. at 854-55. In other words, the work of mortgage underwriters was related to producing the service offered and sold by the bank to the general public, not related to the management or administration of the bank's general business operations. *Id*.

Consistent with the holding of the Ninth Circuit in *McKeen-Chaplin*, Plaintiff argues that real estate appraisers, like Plaintiff and the Class Members, are entitled to overtime wages. *See also Boyd v. Bank of America*, 109 F. Supp. 3d 1273 (C.D. Cal. 2015). That is because, just like the primary duty of mortgage underwriters, the primary duty of real estate appraisers does not relate to management or general business operations. *Id*. at 1294-97. In *Boyd*, the court analyzed each element of the administrative and the professional exemptions from overtime (the same exemptions asserted by Amrock in this case) and held that these exemptions do not apply as a matter of law

Moreover, Plaintiff believes that Amrock conceded in discovery that the Plaintiff and the Class Members were not exempt from overtime in 2016. That is because Amrock failed to pay the minimum required salary to meet any of the "white collar" exemptions from overtime.

"Labor Code § 515(a) exempts from overtime compensation executive, administrative, and professional employees whose primary duties meet the test of exemption," and "**who earn a monthly salary at least twice the state minimum wage for full-time employees**." *Moua v. Int'l Bus. Machines Corp*., Case No. 5:10-cv-01070-EJD, 2017 WL 4355050, at *2 (N.D. Cal. Sept. 29, 2017) (emphasis added, citing *Harris v Super. Ct.*, 53 Cal. 4th 170, 178 (2011)). Further, 8 Cal. Code Regs. § 11040(A)(2)(g) and § 11040(A)(3)(d) state that for the administrative and learned professional exemptions to apply, the employee must "earn[] a monthly salary equivalent to no less than two (2) times the state minimum wage for full-time employment. Full-time employment is defined in Labor Code Section 515 (c) as 40 hours per week." *Id*.

To qualify for these exemptions from overtime, the employee must meet (1) the salary test, and (2) the duties test. *See id*. Both requirements must be satisfied and the employer bears the burden of proving both of them. *Bothell v. Phase Metrics, Inc.*, 299 F.3d 1120, 1124 (9th

Cir. 2002); *Bratt v. Cty. of L.A.*, 912 F.2d 1066, 1068 (9th Cir. 1990). If the employee was not paid the minimum salary, then the duties test is irrelevant because the employee is not exempt as a matter of law. *See, e.g.*, *Moua v. Int'l Bus. Machines Corp.*, Case No. 5:10-cv-01070-EJD, 2017 WL 4355050, at *2 (N.D. Cal. Sept. 29, 2017).

Amrock's 30(b)(6) Representative agreed that both (1) the salary test and (2) the duties test must be satisfied in order for an employee to be classified as exempt. (Doc. 112-1 at page 176, ln. 24 to page 178, ln. 8) (emphasis added). Amrock further admitted that in 2016 it failed to pay Plaintiff and the Class Members the minimum salary necessary to qualify for these exemptions. (*Id.* at page 187, ln. 8 to 188, ln. 11). By failing to pay them the required salary, they were not exempt as a matter of law. (*See id.*)

Plaintiff and the Class Members were paid a monthly salary of **$3,333.33** in 2016 – which was less than the amount needed to satisfy the administrative and professional exemptions in California. (Doc. 112-4 at page 25, lns. 4-8, testifying that Plaintiff and the proposed Class Members were paid an annual salary of **$40,000** per year, not the minimum of **$41,600**). In 2016, the minimum monthly salary necessary to qualify for the exemptions was **$3,466.67** . Thus, there was no reasonable dispute that in 2016, the Plaintiff and Class Members were not exempt from overtime for that year and that their wage statements did not include the number of hours worked on them. Similarly, their duties did not meet any of the requirements to satisfy the administrative or professional exemptions. Given that the wage statements did not include the number of hours worked, they violated California law.

    **2.  Amrock's Evaluation of the Certified Claims (Plaintiff Does Not Join in this Section of the Brief)**

        *i.  Amrock Contends that the Internet and Cell Phone Reimbursement Claim Is Worth Little.*

Plaintiff's reimbursement claims – for (i) internet expense (work, not personal), (ii) cell phone usage (work, not personal), and (iii) travel expenses (work, not personal) – face major hurdles. In each instance and for each class member, Plaintiff must prove the expense (a) was incurred by the ESA, (b) was for business use and <u>not a personal use,</u> (c) was <u>reasonable</u> under

the circumstance, and (d) was <u>necessary</u> under the circumstance.[4]

As the Court observed when initially certifying these claims for class treatment: "<u>individualized questions of damages</u>" may "<u>ultimately render class resolution unmanageable,</u>" <u>and "decertification of the class may be proper.</u>" (Dkt. 154, 4/2/18 order re class/FLSA certification, at 6:17-18 (emphasis added).)   Amrock believes the Court's hesitation to be well-founded.  Plaintiff's admitted inability to separate out his usage, much less his personal and business usage, very likely will lead to manageability problems and, in turn, decertification.

As a starting point, internet and cell phone plans are routinely <u>shared</u> by users, who use "family" and other group plans.[5]  Further, even if one could isolate one user's usage (an ESA's usage) from another's usage (that of a family member or housemate), the question of <u>why</u> one of the users placed a call or used data – e.g., for personal use or a business use? – can be determined only by individual proof.  To quote Plaintiffs' expert: "<u>it would be almost impossible to try and identify data usage prorations</u>" between business and personal usage.  (Dkt. 126 (Ex. 11), Breshears Depo. at 171:8-173:7 (emph. added).)  Likewise, Plaintiff admitted that he could not do this, and that he would be "<u>guessing</u>" in trying to allocate between personal usage and business usage.  (Dkt. 126 (Ex. 10), Swamy Depo., 260:24-261:8, 257:9-16.)  Similarly, when asked via interrogatory to allocate his costs, he – with a month to answer and the assistance of counsel – could provide no answer.  (Dkt. 126 (Ex. 9), Plaintiff's discovery responses.)  Similarly, Plaintiff uses a shared internet plan, which each of the users also use for personal use, and Plaintiff could only "guess" at usage allocations.  (Dkt. 126 (Ex. 10), Swamy Depo., 247:19-248:2, 248:16-19, 419:23-420:7.)

Yet such prorations are precisely what the elements of Section 2802 – on which plaintiffs

---

[4] *See* Cal. Labor Code § 2802; *Marr v. Bank of Am.*, No. C 09-05978-WHA, 2011 WL 845914, at *1 (N.D. Cal. Mar. 8, 2011) (citing *Gattuso v. Harte-Hanks Shoppers, Inc.*, 42 Cal. 4th 554, 568 (2007)).

[5] Dkt. 126 (Ex. 11), Breshears Depo., 162:12-163:6, 167:3-186:6, 190:5-23, 193:22-194:17; Dkt. 126 (Ex. E), Ferris Decl. ¶¶ 14-22; Dkt. 126 (Ex. G), Byrne Decl. ¶¶ 14-16; Dkt. 126 (Ex. H), Long Decl. ¶¶ 12-15; Dkt. 126 (Ex. F), Putnam Decl. ¶¶ 30-39.

1    bear the burden of proof – require.  *Gattuso,* 42 Cal. 4th at 568 (allocations require "detailed

2    record keeping by the employee" as well as "the exercise of judgment (by the employer, the

3    employee, and officials charged with enforcement of section 2802) to determine whether the

4    expenses incurred were reasonable and therefore necessary").  Plaintiff's counsel has stated that

5    the only way to do so is through individualized "testimony from Staff Appraisers [regarding] . . .

6    not being reimbursed for their work related expenses" (Dkt. 109, Plaintiff's motion for class

7    certification, at 6:25-26).  Apart from being quintessentially individualized, even the *named*

8    *Plaintiff* could not do this, even with a month to do so and with the assistance of counsel.

9        Moreover, even *if* these manageability problems could somehow be solved, Plaintiffs'

10    claim overlooks the fact that Amrock provides all ESAs with an iPad with a paid-for data plan

11    and camera.  (Dkt. 126 (Ex. 10), Swamy Depo., 249:11-250:15, 251:1-6;  Dkt. 126 (Ex. E),

12    Ferris Decl. ¶ 20; Dkt. 126 (Ex. G), Byrne Decl. ¶ ; Dkt. 126 (Ex. H), Long Decl. ¶ 16; Dkt. 126

13    (Ex. F), Putnam Decl. ¶ 36.)  This effectively zeros out the claim.

14        Ignoring the iPad altogether, Plaintiff's expert seeks to side-step these issues simply by

15    making assumptions concerning each and every ESAs usage.  Specifically, Plaintiff's expert

16    claims that the "the lowest cost" (though notably unlimited) standalone monthly internet plan in

17    California is $35, and proposes to decree – without allocation, and without acknowledging the

18    provided iPad – that each ESA has proven the elements of his/her claim and should recover that

19    sum.  But this ignores that Plaintiff Swamy – like virtually everyone in modern America –

20    bundles internet with a cell phone plan to reduce costs, and further reduces costs by using a

21    household or family plan with multiple users.  Moreover, Mr. Breshears  also apparently failed to

22    analyze Plaintiff Swamy's own data plan which, combined for all its users (three persons) totaled

23    just $30 per month in the last five months for which Swamy provided his bills, and was just $18

24    (combined for all three) in the month before that.  (See Dkt. 126 (Ex. 4), chart summarizing the

25    Swamy household's internet bills; Dkt. 126 (Ex. 2), bills produced by Swamy.)  But even using

26    $30 (not $18) as the "lowest" available household (three users) plan, and applying that amount

27    across-the-board to all ESAs (to overlook the manageability problem and sidestep the elements

28

of the claim), the amount in controversy would be very modest even making extremely conservative assumptions.

If, for example, we (i) assume the ESA used fully one half of the data on the shared plan, and (ii) assume that the ESA used fully 75% of the data he/she used for a business (not personal) use, that would place in controversy $11.25 per month for each ESA ($30 x .5 x .75 = $11.25). There are 50 months within the three-year limitations period running through the end of May 2018 (the date of the preliminary approval hearing). During that period, there were 42.77 ESAs on average working during each month. (*See* Exhibit "4" - Khan Decl. ¶ 2.) Thus, the maximum exposure on this claim – if it could be proven through assumption – is $24,058 ($11.25 x 50 x 42.77). And even that modest sum assumes a 100% chance of success on the merit, and a 100% chance that the Court would find that simply "assuming" plan and use rates, etc., is a permissible means to overcoming the manageability issue that the Court previously flagged, all while ignoring the provision of and iPad and data plan to each ESA. If we use a mere 25% discount for each of these issues, this nets **$12,029**.

Concerning the cell phone claim, Plaintiff's expert simply chooses a maximum amount available for reimbursement as stated by Amrock beginning in May 2015 ($85), and multiples that by the months in question. That maximum in no way shows the amounts in cell phone usage that ESAs (i) actually, (ii) reasonably, and (iii) necessarily, (iv) incurred – the elements of a legal claim. Put another way, the fact that Amrock voluntarily chose this reimbursement ceiling does not render that rate legally required, much less actually and reasonably incurred by ESAs for business use.

Using the mere handful of cell phone bills produced by Swamy in this action as typical and representative – as a means to overlook manageability problems – yields profoundly different results than those offered by Mr. Breshears. The Swamy household's cell phone charge was $60 per month, plus approximately $20 in monthly fees and taxes, for a household total of $80 per month. (See Dkt. 126 (Ex. 4), chart summarizing the Swamy AT&T bills; Dkt. 126 (Ex. 2), bills produced by Swamy.) Of that, Swamy's phone line usage for calls averaged just 20.11% of the total minutes used, with his wife and daughter using the vast majority of the plan. (*Id.*)

JOINT MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT

From there, even assuming that a generous 25% of his minutes spent on his cell phone each month was for a business purpose, this comes to $4.02 per month ($80 x 0.2011 x 0.25). There are 14 months within a three-year limitations period through the end of May 2015 (after which the class seeks no recovery). As discussed above, there were 42.77 ESAs on average working during this limitations period. (Khan Decl. ¶ 2.) Thus, the maximum exposure on this claim for a cell phone call plan is $2,408 ($4.27 x 14 x 42.77). Again, even that modest sum assumes a 100% chance that each ESA will prevail in full on the claim, and a 100% chance that the Court would find that simply "assuming" that every ESA had exactly the same use rate and usage is a permissible method for overcoming the manageability issue that the Court previously flagged. If, as before, we use a mere 25% discount for each, this nets **$1,204**.

### ii. Amrock Contends that the Vehicle Expense Claim Is Worth Little.

Plaintiff's vehicle expense claim also faces significant hurdles with respect to manageability and the merits. First, there is no evidence in the record to show that all California appraisers (particularly persons in dense urban areas like San Francisco) used a vehicle for business purposes. As Plaintiff admits, moreover, virtually everyone – including Swamy – uses his/her vehicle for personal reasons. (Dkt. 126 (Ex. 10), Swamy Depo.,, 242:2-12, 243:23-244:3.) Further, Plaintiff shares three luxury cars with his wife, and made no effort to track the miles he drove, much less those used for work and those used for personal matters – or even which car he used on any given day. (*Id.*) Expenses, or course, vary widely across different types of vehicles, and many class members may prefer to use actual expenses rather than a standard IRS rate.[6] Further, there is no one-size-fits-all answer to whether any particular ESA's

---

[6] *See e.g.*, *Gattuso*, 42 Cal. 4th at 568 (cit. omitted) ("[A]n employee's choice of automobile will significantly affect the costs incurred. An employee who chooses an expensive model and replaces it frequently will incur substantially greater depreciation costs than an employee who chooses a lower priced model and replaces it less frequently. Similarly, some vehicles use substantially more fuel or require more frequent or more costly maintenance and repairs than others. The choice of vehicle will also affect insurance costs. Other employee choices, such as the brand and grade of gasoline or tires and the shop performing maintenance and repairs, will also affect the actual costs. Thus, calculation of automobile expense reimbursement using the actual expenses method requires not only detailed record keeping by the employee and complex allocation calculations, but also the exercise of judgment (by the employer, the employee, and

personal choices in this regard were "reasonable" and "necessary" for the business task at hand. Moreover, Swamy was provided and used reimbursement forms that include a section for vehicle expenses, but never sought such reimbursement. (*Id.*, 245:23-246:11.)  Finally, Amrock did provide additional compensation—in terms of points used to calculate incentive compensation— to reimburse ESAs for vehicle costs.

Particularly given these variances, Amrock contends that Plaintiff's mileage model will not ultimately withstand scrutiny, and is not manageable.  **First**, Plaintiff's mathematic computations of imagined daily miles – based on a fictional loop of destinations – are flawed because he has no means to identify the destinations that would go into a daily loop – namely the sites actually visited (regardless of the order) on any given daily drive (a necessary component to the loop calculations they would have Google maps run).[7]  Plaintiff's expert simply relies on what Mr. Swamy told him he drove each day, as recorded in one of his logs (but not another handwritten log, which conflicts with the log used).  Of course, determining whether other ESAs maintained such logs and whether those logs accurately recorded the dates of actual travel, would itself present enormous manageability problems.  But even using Mr. Swamy as an example, Mr. Swamy maintained <u>two</u> sets of logs containing <u>conflicting</u> information on the destinations driven each day – sometimes by several days.  (Dkt. 126 (Ex. B), Kemple Decl. ¶ 16; Dkt. 126 (Ex. 7), chart of discrepancies.)  And remarkably, in choosing which of these sets of data he would use, Mr. Breshears (at the direction of Swamy's counsel) used the "appointment date" found in Dkt. 126 (Ex. 6), which likely records the date the appointment was set, while ignoring a separate handwritten log created by Swamy of the "inspection date" ("insp. date").  Worse, he ignored that these dates conflicted.  (Dkt. 126 (Ex. 5),; Dkt. 126 (Ex. 11), Breshears Depo., 44:23-45:11, 64:14-17, 73:10-74:1, 76:8-20; Dkt. 126 (Ex. 7), chart of discrepancies.)  In

---

officials charged with enforcement of section 2802) to determine whether the expenses incurred were reasonable and therefore necessary.").

[7] Mr. Breshears concedes that he does not even know whether ESAs actually drove to, or were driven to, one inspection or another (Dkt. 126 (Ex. 11), Breshears Depo, 31:10-32:9), and conceded that he "cannot step into the shoes of each person on each individualized day."  (*Id.*, 49:12-19, *see also* 58:3-59:15 (same).  He concedes: "I can't tell you with any certainty whether – the exact route a person took on any given day."  (*Id.*, 59:21-60:11.)

this Mr. Breshears' words, "[w]hether that appointment actually occurred has not been taken into account." (Dkt. 126 (Ex. 11), Breshears Depo., 68:5-20, 70:16-71:8 (emphasis added).)  Apart from the fact that all of this assumes fictional driving patterns and loops, even the destinations driven to and within the loop are not known – all of which undermines Mr. Breshears' conclusions.  (*Id.*, 67:9-24, 69:18-70:1, 72:5-13.)

 **Second,** this data is inaccurate for the additional reason that the starting point for any driving measured by this "model" also is not known.  ESA routinely begin their day with personal matters – school activities, the gym, shopping, other recreation or errands – and therefore begin their commute to their first inspection, not from home, but from some other location.  None of this is factored into Mr. Breashears' computations.  As the Court observed when initially certifying these claims for class treatment: "Should individualized questions of damages ultimately render class resolution unmanageable, however, decertification of the class may be proper." (Dkt. 154, 4/2/18 order, at 6:17-18.)   Again, Amrock believes such hesitation is well-founded.

 **Third,** Plaintiff has greatly overstated the miles to which ESAs would be entitled, by assuming that ESAs are entitled to reimbursement for miles incurred driving from home (or the school where they dropped off their children) to the first stop of the day, and then from the last stop back home again – i.e., their <u>commute</u>.  However, commuting back and forth to work is not on an employer's dime.  To illustrate, in *Sullivan v. Kelly Services, Inc*., 2009 WL 3353300, *1 (N.D. Cal. Oct. 16, 2009), the issue was whether a temporary staffing agency was required to reimburse its employees expenses incurred in traveling to interviews.  The court found that "Plaintiff . . . was permitted to travel to and from work in her own vehicle and could effectively use [her] travel time for [her] own purposes." *Id.* at *5. Therefore, the court dismissed the reimbursement claim on summary judgment because "these expenses were not incurred within the scope of her employment" and were not recoverable under Labor Code section 2802. *Id.* at

JOINT MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT

*7-*8.[8]  Indeed, the California Division of Labor Standards Enforcement ("DLSE") has opined that if an employee is aware that the job site for his or her position is not fixed and has a reasonable expectation that he or she may need to travel reasonable distances to different job sites, then the employee's travel expenses are not compensable.  *See* DLSE Op. Ltr. 2003.04.22.

Importantly, the commute miles that Mr. Breashears' includes in his model – and which are not compensable – represent the vast majority of the miles on which his model seeks compensation.  Once an ESA competes his/her commute to inspection site, Mr. Breshears concludes that ESA drove 2 additional miles from that start point to review each comparable properties.  To simplify, analyzing all days on which Breshears concludes there was only a single inspection, reveals an average of 19.8 miles in commuting miles vs. an average of 2 miles for comps.  (Khan Decl., ¶ 4.)  In other words, for this set of the data, 90.8% of the miles would not be eligible for reimbursement.  (*Id.*, ¶ 4.)  Applying that percentage to the approximate $646,000 that Plaintiff claims are at issue, results in an actual valuation of this claims of just $59,432 (9.2% x $646,000).  And again, even that figure ignores discounts for the significant possibility that (i) this Court will reject this "method" (flawed at many points) at trial, or (ii) find that the claim is not unmanageable or otherwise fails on the merits.  If we apply only a 25% discount total for both considerations – though we believe this to be extremely conservative – this still results in an amount in controversy of just **$44,574.**

### iii.  *Amrock Contends that the Wage Statement Claim Is Worth Little.*

Plaintiff claims that his wage statement violates Section 226 by alleging three purported deficiencies, each of which Amrock believes will either fail as a matter of law, or ultimately will not be tried on a class basis.  Moreover, the claim places only a modest sum at issue.

**First**, Swamy falsely claims that he does not receive in each pay period a wage statement that sets forth his gross wage earned, a required by Labor Code section 226(a)(1).  Amrock believes that this claim will be disposed of on summary judgment.  As with virtually all

---

[8] *See also*, *Morillion v. Royal Packing Co.*, 22 Cal. 4th 575, 586-88 (2000) (holding by California Supreme Court that "the time plaintiffs spent commuting from home to the departure points and back again is not" reimbursable because such was part of a normal commute).

employers who use incentive pay and bonus structures, Amrock calculates and processes salary wages separately from bonus wages. (Dkt. 112-17, sample ESA compensation plan.) Each pay period, it issues a wage statement showing the salary component of wages (which shows gross wages up to that point), and a wage statement that adds to the salary component additional sums earned in incentive pay. That second wage statement lists the total gross pay (to include both the salary component and the incentive payment), and accurately states the "gross pay" paid to the employee through that pay period. In other words, Amrock breaks out separately the salary component of wages paid, and the incentive payment component of wage paid, and then totals them and (completely accurately) lists the total payment to date (salary plus incentive pay) as "gross wages," exactly as required by Section 226(a)(1).[9] Amrock believes that this claim will likely be resolved in its favor on summary judgment.

**Second**, Swamy claims that he and other ESAs have actually entered into a "piece rate" agreement with Amrock, and that his wage statements fail to identify the number of piece-rate units earned, and the applicable piece rates as would be required pursuant to Section 226(a)(2). But ESAs are not compensated on a piece rate basis. Piece-rate compensation involves paying a flat rate for a certain unit produced where generally accepted databases of information correlate pieces/units to "labor hours."[10] Here, to prevail on this claim, Swamy would have to show with

---

[9] To illustrate, on March 6, 2015, Amrock first processed Swamy's salary payment of $1,536.46, which brought his YTD wages to $17,622.28. (Dkt. 112-16, Swamy wage statements, at TSI602.) It then processed his incentive bonus of $1,085.00 for the relevant pay period. (*Id.* at TSI601) That brought his YTD wages up by the $1,085, resulting in a YTD total in the second statement of $18,707.28 (exactly $1,085 higher than $17,622.28).

[10] *See Sandoval v. M1 Auto Collisions Centers*, No. 13-cv-03230-EDL, 2016 WL 6561580, *2 n.4 (N.D. Cal. Sept. 23, 2016) ("A task's 'flag hours' are set by an estimating database that calculates the amount of time the average technician takes to complete the repair... These estimates, which are based on industry standards, are designed to take into account the amount of time that the average technician takes to complete the repair"); *Tokoshima v. The Pep Boys—Manny Moe & Jack of Cal.*, No. C-12-4810-CRB, 2014 WL 1677979, *1 (N.D. Cal. Apr. 28, 2014) ("piece rate system" involves payment at "a flat rate for each 'labor hour' that the mechanic accrues" where "a fixed number of 'labor hours' [is assigned] to every service or repair task a mechanic performs … derived from the Mitchell Guide—which is used throughout the industry and provides standard time estimates for every specific service task based on the particular year, make, and model of the vehicle—and are intended to correspond to the actual amount of time a mechanic should require to complete a task.") (cit. omit.).

common proof that there is (i) a single rate paid for each appraisal and (ii) that rate was correlated to a specific number of hours that it generally takes to perform some "typical" appraisal. Swamy has not proposed any evidence on this issue, let alone evidence that is common to the class. That is because he cannot. There is no "typical" appraisal; appraisals take varying lengths of time based on a host of variables related to the appraiser as well as the subject property. (Dkt. 126 (Ex. C), Phillips Decl., ¶¶ 10-44.) Indeed, Swamy confirmed as much at his deposition, testifying that the time it takes him to do appraisals varies by more than 300% across projects (Dkt. 126 (Ex. 10), Swamy Depo., 384:12-388:5). This variance was confirmed by Mike Brocker-Querio, Staff Appraiser Director for Amrock, who testified that the time required to perform any given appraisal can vary by almost 20-fold between one appraisal and the next. (Dkt. 126 (Ex. 12), Brocker-Querio Depo., 264:19-265:13.)

Moreover, unlike a "piece rate" compensation plan, the incentive pay received for any appraisal is based, not upon how long an appraisal took, but upon (i) a subjective evaluation of the complexity of the appraisal project, and (ii) how many other appraisals were completed in the same two-week period. (Dkt. 112-17, ESA compensation plan.) The bonus paid for any given appraisal can vary by as much as three-fold. (*Id.*) Even then, the bonus incentive awarded for any given appraisal may be *increased* by Amrock. There is no set "piece rate." This is a classic bonus structure.[11] Amrock believes it will obtain summary judgment in its favor on this claim.

**Third**, Swamy claims that his wage statements fail to record the hours he worked as is required for non-exempt employees pursuant to Section 226(a)(2). Though originally insisting otherwise, Swamy's counsel now concedes that such hours need not be reported unless the employee is exempt. As such, to maintain this claim, there would need to be a common classwide method to establish whether each ESA is exemption and, if Swamy prevailed on that question as to each ESA, he would then need to establish the actual hours worked by each ESA in each pay period to establish a wage statement violation. Swamy can do neither.

---

[11] *See* DLSE Manual § 2.5.5 ("bonus" includes "contractually required payment where a promise is made that a bonus will be paid in return for a specific result (i.e., exceeding a minimum sales or piece quota)"). As a bonus, it is "is properly determined by the … plans' specific terms." *Schachter v. Citigroup, Inc.*, 47 Cal. 4th 610, 621 (2009).

Concerning exemption, Swamy has relied on *Boyd v. Bank of Am. Corp.*, 300 F.R.D. 431, 440 (C.D. Cal. 2014).  But his reliance is misplaced.  As this Court noted, in *Boyd* "[t]he parties *agree*[*d*] that Appraisers had only one duty: conducting appraisals and generating appraisal reports."  *Boyd v. Bank of Am. Corp.*, 109 F.Supp.3d 1273, 1303 (C.D. Cal. 2015) (emph. added).  The record evidence here, by contrast, demonstrates that Amrock and its customers rely on ESAs for far more than appraisal work to guide their business decisions.  ESAs are unique in that assist the business in charting its course in other ways.  They function as experimenters from which Amrock learns how the business could be improved, develop better processes, better technology, develop a better understanding of how to find efficiencies within the process, and how to improve upon the client service experience.  They assist in software design and testing, review protocols of outside, non-employee appraisers, and participate in pilot programs, beta testing, and the development of propriety software.  As this Court noted, "these differences [in the duties at issue in *Boyd*] may be relevant to the determination of whether class members were properly classified as exempt."  (*See* Dkt. 154, 4/2/18 order, at 8:15-16.)

Importantly, Amrock's ESAs also perform these various tasks in <u>varying</u> degrees. Having noted that these unique duties may render these persons exempt, the Court went on to state that "these additional duties and responsibilities were uniformly imposed on members of the putative class," and on that basis determined that such additional duties therefore "do not render class certification inappropriate."  (Dkt. 154, 4/2/18 order, at 8:10-17.)  Respectfully, Amrock submits that the Court was mistaken here.  Indeed, it is undisputed that ESAs perform these varying duties in <u>varying</u> degrees.[12]  As noted, some ESAs go weeks or months without doing appraisals, and instead work on special projects, such as beta testing.  Other ESAs, like Swamy if his testimony is to be credited, did nothing other than appraisals – a perfect inverse. And the vast majority of ESAs do a combination of these special projects – software design and

---

[12] Dkt. 126 (Ex. 14), Petkovski 30(b)(6) Depo., at 64:12-15; Dkt. 126 (Ex. 12), Brocker-Querio Depo., at 289:3-21 (software design and testing), 198:198:18-21 (reviewing protocols of other appraisers), 200:10-201:1 (same), 205:8-206:10 (beta testing); Dkt. 126 (Ex. E), Ferris Decl. ¶ 7; Dkt. 126 (Ex. G), Byrne Decl. ¶¶ 6-7; Dkt. 126 (Ex. H), Long Decl. ¶ 6; Dkt. 126 (Ex. F), Putnam Decl. ¶¶ 12-13.

testing, protocol reviews of other appraisers, pilot programs, beta testing, development of software etc. – in varying degrees. Still other ESAs serve in a supervisory capacity, while others do not. Further, Amrock also believes that even ESAs appraisal activities (which vary between ESAs) are exempt, particularly given the use made of them by Amrock and its primary customer.[13] Given this variance, a court evaluating the applicability of an exemption "must conduct an individualized analysis of the way each employee actually spends his or her time, and not simply review the employer's job description." *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 945 (9th Cir. 2009). In short, apart from these activities rendering ESAs to be exempt, we believe the facts will show an absence of uniformity in the variety and degrees they are performed, and that the Court will find this claim too to be unmanageable.

Setting aside the exemption question, Amrock believes it would prevail on this claim in any event, as Swamy cannot establish the actual hours that ESAs worked, which hours he claims should have been listed on the wage statements. (See e.g., Dkt. 154, at pp. 9-12.) As a result, Swamy cannot show that the wage statements are inaccurate as to himself in any particular two-week pay period, much less inaccurate for all California ESAs in all pay periods.

Moreover, each of these theories under Labor Code section 226 is defeated if Amrock acted in <u>good faith</u> (even though in technical non-compliance). To establish a claim under Section 226, claimants must prove that the defendant "knowing[ly]" and "intentional[ly]" violated section 226. *Amaral v. Cintas Corp. No. 2*, 163 Cal.App.4th 1157, 1195 (2008) (inadvertent on-compliance is not actionable). If the employer had a "<u>good faith</u>" belief that it

---

[13] ESAs provide expert opinions of value, based on highly discretionary and inherently intellectual processes requiring application of skill, judgment and experience. (Dkt. 126 (Ex. C), Phillips Decl. ¶¶ 11-44.) Given this discretion, and the wide variety of factors and activities that relate to appraising divergent properties for divergent purposes, appraisal values vary. Further, Amrock's primary customers, base their business decisions of whether to offer home loans to end customers and, if so, on what terms, and in what markets, on the expert valuation services provided by ESAs. These facts also support the conclusion that Amrock's ESAs are, in fact, exempt. *See* Wage Order 4 (found at Cal. Code Regs. tit. 8, § 11040) ("(2) Administrative Exemption. A person employed in an administrative capacity means any employee: (a) Whose duties and responsibilities involve…: (i) The performance of office or non-manual work directly related to management policies or *general business operations of his/her employer or his/her employer's customers*") (emph. added).

was not required to report an item in question, or reported it as required, then there could be no liability under Section 226.[14]  Importantly, "[t]he fact that a defense is ultimately unsuccessful will not preclude a finding that a good faith dispute did exist."  8 Cal. Code Regs. § 13520 (2006) (emphasis added.)  Further, "penalties can only be recovered under Labor Code … 226(e) for knowing, intentional, and willful violations, not mere recklessness."  *Pedroza,* 2012 WL 9506073., *5 (emphasis added).

At minimum, even if Amrock lost on the question of "piece rate" compensation, or an exemption defense (if actual hours could then be proven), Amrock acted in good faith in connection with the Section 226 theories advanced by Plaintiff.  *See Pedroza,* 2012 WL 9506073, *5 ("PetSmart has certainly presented a defense—the executive exemption affirmative defense—that, if successful, will preclude Plaintiff from recovering. Further, this defense is reasonable, supported by evidence, and Plaintiff presents no evidence that it has been presented in bad faith. That PetSmart has not met the high burden on summary judgment in demonstrating that the exemption applies to Plaintiff does not mean that the Parties' dispute about Plaintiff's exempt status is not a "good faith dispute.").  For this reason too, Amrock believes Plaintiffs Section 226 claim – even were it manageable – will fail as a matter of law.

Moreover, the amount in controversy on this claim are modest.  At most class members could recover (i) $50[15] (ii) per participating ESA (iii) per pay period (iv) within the one-year limitations period.  There are 58 pay periods within the limitations period through the end of this month.  As Plaintiff concedes, this claim would create a maximum exposure of $1244,000.  But again, that sum must be discounted for the points made above.  Again assigning only the very

---

[14] See *Pedroza v. PetSmart, Inc.,* 2012 WL 9506073, *4-6 (C.D. Cal. 6/14/12) ("PetSmart argues that it is entitled to summary judgment on these claims because a 'good faith dispute' exists regarding whether Plaintiff was misclassified, and thus, as a matter of law, it could not have acted knowingly, intentionally, or willfully.  We agree.  The good faith defense to the willfulness element of these sections [Labor Code section 226 and 203] is clearly established under California law."); *Aguilar v. Zep Inc.,* 2014 WL 4245988, *19 (N.D. Cal. 8/27/14) (same).

[15] Because Amrock has not been cited for a wage statement violation, the $50 penalty threshold applies.  *Amalgamated Transit Un. Local 1309, AFL-CIO v. Laidlaw Transit Servs., Inc.,* 2009 WL 2448430 *1,9 (S.D. Cal. 2009); *Amaral v. Cintas Corp. No 2,* 163 Cal.App.4th 1157, 1209 (2008*; Willis v. Xerox Bus. Servs., LLC,* 2013 WL 6053831 *1, 6 (E.D. Cal. 2013).

25% conservative discounts for these considerations yields the following: 25% chance that Plaintiff cannot avoid decertification for unmanageability = $90,000 (.75 x $124,000); 25% chance that these claims will fail on the merits = $67,500 (.75 x $90,000); 50% chance that Amrock can establish that it acted correctly or at least in good faith on these issues = $33,750 (.5 x $67,500).  Thus, applying even very conservative discounts, Amrock believes that Plaintiff's class wage statement claim pencils out to a "value" of about **$33,750**.  But to be clear, we believe that Amrock's chance of success on each point is greater than stated above.

*      *      *

As discussed above, in Amrock's view, the combined amount in controversy on these claims conservatively calculated is approximately **$92,000**, as follows: internet data plan ($12,000); cell phone ($1,200); vehicle expenses ($45,000); wage statements ($333,750).

## C.    The Settlement Satisfies This Court's Other Concerns Regarding Settlements.

The Parties' proposed settlement agreement complies with the factors listed in this Court's Notice on Class Settlement Factors and the Procedural Guidance for Class Action Settlements in this District (the "Procedural Guidance").  Most importantly, the Settlement was reached after the Class Certification Order, with the same Plaintiff on behalf of the same classes as certified by the Court.  Second, The Settlement "does not improperly grant preferential treatment to the [Plaintiff] or segments of the class." *Portal Software*, 2007 WL 1991529, at *5.  Plaintiff will be receiving his proportionate share of the Class Damages according the same formula is the rest of the Class Members.  *See NASDAQ*, 176 F.R.D. at 102 (settlement may be approved preliminarily where it does not improperly grant preferential treatment to class representatives or segments of the class").  While the Settlement anticipates the possibility that Class Counsel will apply for a service award for Plaintiff, the Settlement is in no way conditioned on receiving this award.  Third, "the scope of the class settlement release of claims is reasonable and sufficiently limited." *Charles Schwab Corp. Secs. Litig.*, 2011 WL 1481424, at *6. Consistent with the Notice on Class Settlement Factors, the Settlement releases only those claims certified in this action.  Fourth, there is also no reverter to the Amrock for settlement

payments to settlement Class Members that go uncashed.  Fifth, participation is automatic for everyone who does not opt-out; there are no claim procedures – onerous or otherwise.

### D.    The Proposed Notice Plan Meets All Requirements.

Plaintiff also requests that the Court approve the form and content of the proposed Notice (attached as Exhibit B to the Settlement Agreement). The proposed form of Notice fully complies with the requirements of Rule 23, the Procedural Guidance, and due process, and is substantially similar to the prior notice of class certification approved by the Court. The Notice apprises class members of the nature of the Action, the definition of the Class, the class claims and issues, and the claims that will be released.  Additionally, the Notice: (1) describes the Settlement and maximum recovery for each individual; (2) explains that the Parties disagreed regarding whether any damages were recoverable even if Plaintiff prevailed on his claims and includes a brief description of why the Parties are proposing the Settlement; (3) includes a brief description of a request for attorney fees and expenses, as well as the request for the Service Award; (4) advises of the binding effect of a Judgment on Class Members; (5) advises that a Class Member may enter an appearance through counsel if desired; (6) states that the Court will exclude from the Class any Class Member who requests exclusion (and sets forth the procedures and deadline for doing so); (7) describes how to object to the proposed Settlement; (8) describes how payment is effectuated; (9) provides the names, addresses and telephone numbers of representatives of the Administrator and Class Counsel who will be available to answer questions from Class Members:  and (10) states the date, time and location of the Final Approval Hearing and advises Class Members to check the Court's PACER site. These disclosures are thorough and should be approved.

Notice by first-class mail and email satisfies the requirements of due process and Rule 23. *See Portal Software*, 2007 WL 1991529, at *7.

### E.    The Intended Request for Attorneys' Fees and Expenses.

Class Counsel intends to request an attorney fee award of no greater than $1.5 million to correspond to Class Counsel's lodestar. *See* Foty Declaration. Amrock intends to oppose this request.  In addition, Class Counsel intends to request reimbursement of its costs and expenses

not to exceed $150,000. *See* Foty Declaration. But in any event, as discussed above, any fees and costs will be paid by Amrock directly, and will not in any way diminish the amount available to settlement class members.  Indeed, the Settlement Agreement is not conditioned on the amount of any attorneys' fees and costs awarded, and Amrock retains the right to oppose any of these requests, without limitation, and reserves for now its arguments concerning the amounts stated by Plaintiff above. This is consistent with the Notice on Class Settlement Factors.

## F.  The Claims Administrator.

Plaintiff also requests that the Court approve the appointment of Simplurus as the Claims Administrator to distribute the Notice to the Class Members and to distribute the Settlement payments.  Simplurus has extensive relevant experience and is a nationally-recognized notice and administration firm. (Exhibit "5" – CV of Simplurus with Class Administration Proposal). The Claims Administrator will mail the Notice to all Class Members. The maximum amount that will be paid to the Claims Administrator is a modest $7,000 representing approximately 1.2% of the Settlement Fund. (*See id*.)

## G.    CAFA Notice.

Under the Class Action Fairness Act (CAFA), 28 U.S.C. § 1715, "[n]ot later than 10 days after a proposed settlement of a class action is filed in court, each defendant that is participating in the proposed settlement shall serve upon the appropriate State official of each State in which a class member resides and the appropriate Federal official, a notice of the proposed settlement[.]" Amrock will separately prepare and mail the notice required by 28 U.S.C. § 1715 (b) by May 31, 2018.

## H.    Schedule for Final Approval Proceedings.

As set forth in the Settlement Agreement, the following is the proposed schedule for the remaining deadlines in the preliminary and final approval proceedings:

| ACTION | DEADLINE |
| --- | --- |
| Deadline for Mailing CAFA Notice, 28 U.S.C. § 1715 (b) | May 31, 2018 |
| Deadline for Mailing Notice | 14 days after entry of Preliminary Approval Order |

| Deadline to Opt-Out | 44 days after entry of Preliminary Approval Order |
| Filing Deadline for Objections | 59 days after entry of Preliminary Approval Order |
| Party Responses to Objections | 10 days prior to Final Approval and Fairness Hearing Date |
| Final Approval Hearing | At least 90 days after preliminary approval |

## III.  CONCLUSION

Accordingly, based on the Settlement Agreement, the attachments to the Settlement Agreement, this memorandum of law and the prior proceedings in this matter, the Parties respectfully requests that the Court grant preliminary approval of the proposed Settlement, approve the Notice, and enter the proposed Preliminary Approval Order submitted herewith.

Respectfully submitted,

Dated:  May 21, 2018           KENNEDY HODGES, LLP

                               By:   _/s/ Don Foty_
                                    Don Foty
                                    Attorneys for Plaintiff and the Class

Dated:  May 21, 2018           GREENBERG TRAURIG, LLP

                               By:   _/s/ Mark Kemple_
                                    Mark D. Kemple
                                    Attorneys for Defendant Amrock Inc.
                                    (f/k/a Title Source, Inc.)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### CERTIFICATE OF SERVICE

I certify that on May 21, 2018 I filed this document on the Northern District of California CM/ECF system which will serve a true copy on all parties of record via electronic mail.

/s/ Don Foty
Don Foty

JOINT MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT