KENNEDY HODGES, LLP
Don Foty (TX Bar No. 24050022) (Admitted *pro hac vice*)
Galvin Kennedy (TX Bar No. 00796870) (Admitted *pro hac vice*)
4409 Montrose Blvd, Suite 200
Houston, Texas 77006
Phone: (713) 523-0001; Fax: (713) 523-1116
Email: dfoty@kennedyhodges.com
　　　　gkennedy@kennedyhodges.com
Counsel for Plaintiff and the Class

Mark D. Kemple (SBN 145219) (kemplem@gtlaw.com)
Adil M. Khan (SBN 254039) (khanad@gtlaw.com)
GREENBERG TRAURIG, LLP
1840 Century Park East, Suite 1900
Los Angeles, California 90067-2121
Telephone: (310) 586-7700 / Facsimile: (310) 586-7800

Jeffrey Morganroth (*Admitted Pro Hac Vice*) (JMorganroth@morganrothlaw.com)
MORGANROTH AND MORGANROTH PLLC
344 N. Old Woodward Avenue, Suite 200
Birmingham, MI 48009
Telephone: (248) 864-4000 / Facsimile: (248) 864-4001
Attorneys for Defendant Amrock Inc. (f/k/a Title Source, Inc.)

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SOM SWAMY, on Behalf of Himself and on Behalf of All Others Similarly Situated,<br><br>　　　　Plaintiff,<br><br>V.<br><br>TITLE SOURCE, INCORPORATED,<br><br><br>　　　　Defendant. | § Case No.: 3:17-cv-01175-WHA<br>§ CLASS AND COLLECTIVE ACTION<br>§<br>§ **JOINT MOTION FOR FINAL**<br>§ **APPROVAL OF CLASS ACTION**<br>§ **SETTLEMENT; DECLARATION OF**<br>§ **MARY BUTLER; DECLARATION OF**<br>§ **ELIZABETH MILLS**<br>§<br>§ [PROPOSED] JUDGMENT SUBMITTED<br>§ HEREWITH<br>§<br>§ Hearing Date:　September 4, 2018<br>§ Time:　　　　　12 p.m.<br>§ Courtroom:　　12<br>§ 　Judge:　　　　Hon. William H. Alsup |

JOINT MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT
DAL 80753068v4

1    **PLEASE TAKE NOTICE** that on September 4, 2018, at 12 p.m., or as soon thereafter

2  as the matter may be heard, in Courtroom 12, Nineteenth Floor, before the Honorable William H.

3  Alsup, Plaintiff Som Swamy ("Swamy" or "Plaintiff") and Defendant Title Source, Inc., now

4  known as Amrock ("Amrock" or "Defendant") will move this Court to finally approve the

5  proposed settlement of this action (the "Settlement"), and enter the proposed Judgment submitted

6  herewith as called for by the terms of the Settlement (*see* Docket 163-1, Exhibit to Declaration of

7  Don Foty, at Sections I. N. and I. J.3). The proposed Settlement creates a settlement fund of six

8  hundred thousand dollars ($600,000) to be paid by Amrock for the benefit of the Settlement

9  Class.  If finally approved, the proposed Settlement would resolve each of the claims that the

10  Court has certified for class treatment.

11    This Motion is made on the grounds. among others, that the Settlement is fair, adequate,

12  and reasonable given the relative strengths and weaknesses of the Parties' claims and defenses,

13  the risks, expense, complexity and likely duration of the litigation but for the settlement, and the

14  amount offered in settlement, especially in light of the amounts in controversy on these claims.

15  Further, and as clear validation of the reasonableness of the settlement, the Parties note that, after

16  proper notice to all class members, *none* have objected to this settlement, and just *five* persons

17  (10% of the class) have chosen not to participate in the settlement.  In short, the reaction of the

18

19

20

21

22

23

24

25

26

27  / / /

28

class has been positive.  This Motion is based on the Memorandum of Points and Authorities submitted below, and the materials cited herein.

Respectfully submitted,

Dated:  July 24, 2018                    KENNEDY HODGES, LLP

By:  _____/s/ Don Foty_____
                                                    Don Foty
                                                    Attorneys for Plaintiff and the Class


Dated:  July 24, 2018                    GREENBERG TRAURIG, LLP

By:  _____/s/Mark D. Kemple_____
                                                    Mark D. Kemple
                                                    Attorneys for Defendant Amrock Inc.
                                                    (f/k/a Title Source, Inc.)


*        *        *

## ATTESTATION

I, Mark D. Kemple, am the ECF User whose ID and password are being used to file this stipulation and proposed order. In compliance with Civil Local Rule 5-1(i)(3), I hereby attest that attorney Don Foty concurred in this filing.

By:  _____/s/ Mark D. Kemple_____
                                                    Mark D. Kemple

JOINT MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT
DAL 80753068v4

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ............................................................................................ 1

II.   OVERVIEW OF THE LITIGATION ........................................................... 2

III.  THE MEDIATION ....................................................................................... 2

IV.   THE SETTLEMENT .................................................................................... 3

V.    THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE, AND SHOULD
      RECEIVE FINAL APPROVAL. ................................................................. 4

      A.    The Strength/Weakness of Plaintiff's Case. ..................................... 6

            1.    Plaintiff's Evaluation of the Certified Claims (Amrock Does Not Join in
                  this Section of the Brief) ......................................................... 7

                  a.    The Class Members incurred work related expenses for Amrock
                        without reimbursement. .......................................... 7

                  b.    Plaintiff Contends that the wage statements issued by Amrock
                        failed to comply with the California Labor Code. ................. 8

            2.    Amrock's Evaluation of the Certified Claims (Plaintiff Does Not Join in
                  this Section of the Brief) ........................................................ 11

                  a.    The Internet and Cell Phone Reimbursement Claim. ................ 11

                  b.    The Vehicle Expense Claim ....................................... 15

                  c.    The Wage Statement Claim. ...................................... 18

      B.    The Risk, Expense, Complexity, and Likely Duration of Further Litigation. ...... 25

      C.    Plaintiff's View of the Amount Offered in Settlement. .......................... 25

      D.    The Extent of Discovery and the Stage of the Proceedings. ..................... 26

      E.    The Experience and Views of Counsel. ......................................... 26

      F.    The Reaction of the Class Members to the Proposed Settlement. ................. 27

      G.    Arm's-Length Negotiation and Settlement. ..................................... 27

      H.    The Settlement Satisfies This Court's Other Criteria Regarding Settlements. ..... 30

VI.   CONCLUSION ............................................................................................ 31

JOINT MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT

DAL 80753068v4

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Adoma v. Univ. of Phoenix, Inc.*,
   913 F.Supp.2d 964 (E.D. Cal. 2012)...................................................................26

*Aguilar v. Zep Inc.*,
   2014 WL 4245988 (N.D. Cal. 8/27/14) ..............................................................23

*Alberto v. GMRI, Inc.*,
   252 F.R.D. 652 (E.D .Cal. Jun 24, 2008).............................................................28

*Allen v. Bedolla*,
   787 F.3d 1218 (9th Cir. 2015) ...............................................................................4

*In re Am. Bank Note Holographics, Inc.*,
   127 F.Supp.2d 418 (S.D.N.Y. 2001)....................................................................27

*Amalgamated Transit Un. Local 1309, AFL-CIO v. Laidlaw Transit Servs., Inc.*,
   2009 WL 2448430 (S.D. Cal. 2009) .....................................................................24

*In re Austrian & German Bank Holocaust Litigation*,
   80 F.Supp.2d 164 (S.D.N.Y. 2000).......................................................................27

*Barcia v. Contain-A-Way, Inc.*,
   2009 U.S. Dist. LEXIS 17118 (S.D. Cal. 2009) ....................................................6

*Bothell v. Phase Metrics, Inc.*,
   299 F.3d 1120 (9th Cir. 2002) .............................................................................10

*Bower v. Cycle Gear, Inc*,
   2016 WL 4439875 (N.D. Cal. Aug. 23, 2016) .....................................................25

*Boyd v. Bank of Am. Corp.*,
   109 F.Supp.3d 1273 (C.D. Cal. 2015) ..................................................................21

*Boyd v. Bank of Am. Corp.*,
   300 F.R.D. 431 (C.D. Cal. 2014)..........................................................................21

*Bratt v. Cty. of L.A.*,
   912 F.2d 1066 (9th Cir. 1990) .............................................................................10

*Bronkhorst v. Safeco Corp.*,
   529 F.2d 943 (9th Cir. 1976) .................................................................................4

*Browning v. Yahoo!, Inc.*,
    2007 U.S. Dist. LEXIS 86266 (N.D. Cal. 2007) ...................................................6

*In re Charles Schwab Corp. Sec. Litig.*,
    No. C 08-01510 WHA, 2011 WL 1481424 (N.D. Cal. Apr. 19, 2011)......................28, 29, 30

*Class Plaintiffs v. Seattle*,
    955 F.2d 1268 (9th Cir. 1992) .............................................................4, 5, 6

*Glass v. UBS Fin. Servs.*,
    2007 U.S. Dist. LEXIS 8476 (N.D. Cal. Jan. 26, 2007) .......................................28

*Hanlon v. Chrysler Corp.*,
    150 F.3d 1011 (9th Cir. 1998) ............................................................5, 6

*Hopson v. Hanesbrands Inc.*,
    2009 U.S. Dist. LEXIS 33900 (N.D. Cal. 2009) .............................................6

*In re Immune Response Sec. Litig.*,
    497 F.Supp.2d 1166 (S.D. Cal. 2007)......................................................5

*Laskey v. Int'l Union*,
    638 F.2d 954 (6th Cir. 1981) ............................................................27

*Mandujano v. Basic Vegetable Prods., Inc.*,
    541 F.2d 832 (9th Cir. 1976) ............................................................27

*Marr v. Bank of Am.*,
    No. C 09-05978-WHA, 2011 WL 845914 (N.D. Cal. Mar. 8, 2011)..........................11

*McKeen-Chaplin v. Provident Savings Bank*,
    862 F.3d 847 (9th Cir. 2017) ............................................................9

*Moua v. Int'l Bus. Machines Corp.*,
    Case No. 5:10-cv-01070-EJD, 2017 WL 4355050 (N.D. Cal. Sept. 29, 2017).................10

*In Re NASDAQ Market-Makers Antitrust Litig.*,
    176 F.R.D. 99 (S.D.N.Y. 1997) .........................................................30

*Nat'l Rural Telcomms. Coop. v. DIRECTV, Inc.*,
    221 F.R.D. 523 (C.D. Cal. 2004) ........................................................25

*In re NVIDIA Corp. Derivative Litig.*,
    No. C-06-06110-SBA (JCS), 2008 WL 5382544 (N.D. Cal. Dec. 22, 2008) ..................29

*Officers for Justice v. Civil Serv. Comm'n of City & Cty. of S.F.*,
    688 F.2d 615 (9th Cir. 1982) ............................................................5

JOINT MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT

DAL 80753068v4

*In re Omnivision Techs., Inc.*,
   559 F.Supp.2d 1036 (N.D. Cal. 2008) ................................................................29

*Ontiveros v. Zamora*,
   2014 WL 3057506 (E.D. Cal. July 7, 2014) ........................................................25

*In re Optical Disk Drive Antitrust Litig.*,
   303 F.R.D. 311 (N.D. Cal. 2014) ........................................................................14

*Pedroza v. PetSmart, Inc.*,
   2012 WL 9506073 (C.D. Cal. 6/14/12) ...............................................................23

*In Re Portal Software, Inc. Sec. Litit.*,
   2007 WL 1991529 (N.D. Cal. June 30, 2007) .....................................................30

*Rodriguez v. West Publ'g Corp.*,
   2007 U.S. Dist. LEXIS 74767 (C.D. Cal. filed Sept. 10, 2007) .....................25, 27

*Sandoval v. M1 Auto Collisions Centers*,
   No. 13-cv-03230-EDL, 2016 WL 6561580 (N.D. Cal. Sept. 23, 2016)................19

*Stoetzner v. U.S. Steel Corp.*,
   897 F.2d 115 (3d. Cir. 1990).............................................................................27

*Stuart v. RadioSchack Corp.*,
   641 F.Supp.2d 901 (N.D. Cal. 2009) ....................................................................7

*Sullivan v. Kelly Services, Inc.*,
   2009 WL 3353300 (N.D. Cal. Oct. 16, 2009) ......................................................17

*Tan v. GrubHub*,
   171 F. Supp. 3d 998 (N.D. Cal. 2016) ..................................................................7

*Tokoshima v. The Pep Boys—Manny Moe & Jack of Cal.*,
   No. C-12-4810-CRB, 2014 WL 1677979 (N.D. Cal. Apr. 28, 2014)....................19

*Vinole v. Countrywide Home Loans, Inc.*,
   571 F.3d 935 (9th Cir. 2009) ..............................................................................22

*In re Wash. Public Power Supply System Sec. Litig.*,
   720 F. Supp.1379 (D.Ariz. 1989) ........................................................................28

*West v. Circle K Stores, Inc.*,
   2006 U.S. Dist. LEXIS 76558 (E.D. C.A. 2006).................................................26

*Williams v. Centerplate, Inc.*,
   2013 U.S. Dist. LEXIS 121307 (S.D. Cal. filed Aug. 26, 2013)..........................26

Case No. 3:17-cv-01175-WHA
JOINT MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT
DAL 80753068v4

*Willis v. Xerox Bus. Servs., LLC*,
 2013 WL 6053831 (E.D. Cal. 2013)...................................................................24

*Zynga, Inc.* Sec. Litig.,
 2015 WL 6471171 (N.D. Cal. Oct. 27, 2015)......................................................29

**State Cases**

*Amaral v. Cintas Corp. No. 2*,
 163 Cal.App.4th 1157 (2008) ......................................................................23, 24

*Gattuso v. Harte-Hanks Shoppers, Inc.*,
 42 Cal. 4th 554 (2007) ................................................................................12, 15

*Morillion v. Royal Packing Co.*,
 22 Cal.4th 575 (2000) ........................................................................................17

*Schachter v. Citigroup, Inc.*,
 47 Cal.4th 610 (2009) ........................................................................................20

**Federal Statutes**

29 U.S.C. § 201 ...........................................................................................................2

**State Statutes**

California Business & Professions Code § 17200 ....................................................2, 4

California Labor Code § 203 ........................................................................................23

California Labor Code § 226 .....................................................................2, 4, 18, 23

California Labor Code § 226(a) ....................................................................................8

California Labor Code § 226(a)(1) .........................................................................18, 19

California Labor Code § 226(a)(2) .........................................................................19, 20

California Labor Code § 226(a)(3) ..............................................................................11

California Labor Code § 226(e) ...................................................................................23

California Labor Code § 515(a) .....................................................................................9

California Labor Code § 515(c) ...................................................................................10

California Labor Code § 2802 .............................................................................. *passim*

JOINT MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT

DAL 80753068v4

**Rules**

Federal Rules of Civil Procedure, Rule 23 ......................................................... *passim*

Federal Rules of Civil Procedure, Rule 23(e)(2) ...............................................4

**Regulations**

8 C.C.R. § 11040..................................................................................................22

8 C.C.R. § 11040(A)(2)(g)...................................................................................10

8 C.C.R. § 11040(A)(3)(d)...................................................................................10

8 C.C.R. § 13520..................................................................................................23

**Other Authorities**

15 Wage & Hour Cas. 2d (BNA) 1330 (N.D. Cal. 2007)..................................28

DLSE Manual § 2.5.5 ..........................................................................................20

Newberg and Conte, Newberg on Class Actions (4th ed. 2002) ...................5, 6, 25, 27

JOINT MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT

DAL 80753068v4

## I.    INTRODUCTION

On May 31, 2018, this Court preliminarily approved the Parties' class action Settlement, including the proposed Notice to the Class, finding that it was "fair, reasonable and adequate to the members of the class, subject to further consideration at the final approval hearing."  (Dkt. 168.)

Thereafter, the parties engaged Simpluris, Inc. ("Simpluris") to act as Claims Administrator, who then administered the settlement pursuant to the Court's Order.  Specifically, on June 14, 2018, after processing the addresses timely provided by Amrock for all class members through the National Change of Address Database ("NCOA") maintained by the U.S. Postal Service, Simpluris mailed the Court-approved Notice packet to each class member. (Declaration of Mary Butler ("Butler Decl."), ¶¶6-8.)  Thereafter, a skip trace was performed for the two Notice packets that were returned as undeliverable and those packets were mailed to the updated address.  (*Id*. ¶9.)  In addition, on June 14, 2018, Amrock emailed the notice and opt-out forms to each class member, informing him/her of the settlement, the right to opt out, and the right to object.  (Declaration of Elizabeth Mills.)  Thereafter, not a single class member objected to this settlement.  (*Id*. ¶13.)  Further, of the fifty class members, only five (10%) have elected to opt-out of the settlement.  (*Id*. ¶12.)  In short, the reaction of the Class has been positive.  Indeed, the recovery of participating class members averages $11,666.39 each.  (Butler Decl."), ¶12.)

The Parties now request that the Court grant final approval of this Settlement, as it satisfies the standards for final approval set forth in Federal Rule of Civil Procedure Rule 23 and this Court's Orders.  The Parties also request that the Court entered the Judgment submitted herewith, and as called for by the terms of the Parties' Settlement.  (*See* Docket 163-1 PP. 4-36, Settlement, at sections I. N., and I. J.3.)[1]

---

[1] Section I. N. of the Settlement provides: "Effective Date" means the 31st day after all of the following have occurred: (1) the Court enters an order granting final approval of this Settlement Agreement and judgment in the Action (as discussed in Section II.J.);…"  Section I. J.3 of the Settlement provides: "In connection with the Final Approval Hearing, the Parties will submit a Final Approval Order and Judgment to the Court for its approval. After entry of the Final Approval Order and Judgment, the Court will have continuing jurisdiction solely for purposes of addressing: (i) the interpretation and enforcement of the terms of the Settlement Agreement, (ii)

## II.    OVERVIEW OF THE LITIGATION

On March 7, 2017, Plaintiff Swamy filed this action alleging that Amrock (1) misclassified him as exempt from overtime, (2) failed to reimburse him for all reasonable and necessary vehicle, cell phone, and home Internet expenses, (3) provided to him invalid wage statements, and (4) a derivative violation of California Business & Professions Code §§ 17200, *et seq.* (through violation of California Labor Code § 2802 and/or California Labor Code § 226). (*See* Doc. 1.).  Plaintiff sought to bring this lawsuit as a collective action under the Fair Labor Standards Act, 29 U.S.C. § 201, et seq. and as a Rule 23 Class Action under the California Labor Code. *Id*. Plaintiff sought damages on his behalf and on behalf of the putative class. *Id*.

On January 18, 2018, Plaintiff filed his Motion for Class Certification under Rule 23 and a renewed Motion for Conditional Certification under the FLSA. (Doc. 109 and 110).  In response, the Court certified the following class under Rule 23: "All persons employed by Title Source [now Amrock] as an External Staff Appraiser in California at any time from March 7, 2013, through the present [April 2, 2018]." (Doc. 154 at page 15).   The Court ruled that the class could proceed with respect to a subset of Plaintiff's state law claims relating to reimbursement and wage statements.  It declined to certify a class with respect to Plaintiff's overtime claims under California law and declined to certify the national FLSA overtime action for collective treatment.

The Parties then submitted their joint class notice plan and requested the opportunity to engage in settlement discussions. (Doc. 155 and 157).  The Court granted the Parties' class notice plan and extended the current pre-trial deadlines. (Doc. 156 and 158).

## III.    THE MEDIATION

On May 4, 2018, the Parties participated in an all-day mediation session with David Rotman, a mediator with extensive experience in class action matters.  In advance of the mediation, Amrock also produced anonymized information for the entire class, which Plaintiff's

settlement administration matters, and (iii) such post-judgment matters as may be appropriate under Court rules or as set forth in this Settlement Agreement. The Final Approval Order and Judgment will expressly state that there has been no finding of liability."   The Parties Judgment is lodged herewith, and attached hereto as Exhibit A.

expert (David Breshears) analyzed to estimate potential recoveries on the certified claims using Plaintiff's proposed methodology.  Mr. Rotman played an active role in the May 4 settlement negotiations, which last more than 12 hours, including by identifying each side's strengths, weaknesses, and risks.  Mr. Rotman also had the benefit of detailed briefs, dozens of exhibits (including mathematical modeling and deposition excerpts), and hours of in-person discussions with the parties and their counsel.  This process culminated in Mr. Rotman making a neutral and informed mediator's proposal, which both sides accepted.

## IV.    THE SETTLEMENT

The Parties' settlement allocates $587,500 to Class Members proportionally based on their dates of employment, and class counsel's and Plaintiff's expert's estimate of the number of miles they are projected to have driven each year during the class period. It includes no claims procedure, and no reversion to the defendant for uncashed checks issued to class members.  A copy of the Settlement Agreement is found at Docket 163-1 (Exhibit 1 to the Foty Declaration).

The Parties believe that this is a generous settlement because the class certified by the Court is receiving substantial benefit while simultaneously avoiding the risks associated with a trial on the merits.  While the parties have different views on the potential exposure posed by the certified claims, discussed in part herein, the settlement recovery to the Class represents approximately 70% of the class damages calculated by Plaintiff, and represents several multiples of the maximum potential class damages as calculated by Amrock should a class ultimately prove to be manageable and should plaintiff prevail on a classwide basis on all claims.  Under Plaintiff's damage model, if Plaintiff prevailed on all the claims certified for class treatment, the Class Members would be owed: (1) $646,565.20 for their vehicle expense reimbursement claim, (2) $68,868.09 for their home Internet expense reimbursement claim, (3) $46,257 for their cell phone expense reimbursement claim, and (4) $97,000 for their invalid wage statement claim. This yields total class damages of $858,690.29 under Plaintiff's model.  As described herein, Amrock estimates the amount in controversy, after applying various discounts, to be approximately $92,000 for all certified claims.

JOINT MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT

Each Class Member who did not properly opt-out will receive a settlement award that corresponds to his/her dates of employment (for the wage statement, phone expense, and internet expense claims) and an estimate of the number of miles driven for inspections, using a formula proposed by Plaintiff's expert, David Breshears. (Dkt. 163-2, ¶¶7-10, 13-16.)[2]  Importantly, there is no claim process to receive a payment.  Each is receiving on average $11,666, and is granting a release of only those claims that were certified for class treatment.[3]

This Court preliminarily approved this settlement on May 31, 2018.  (Dkt. 168.)  After complying with the Court's Notice procedures, the reaction of the class has been positive.  There have been no objections to the Settlement, and only five persons (out of fifty) have elected not to participate in the Settlement.

## V.    THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE, AND SHOULD RECEIVE FINAL APPROVAL.

There is a "strong judicial policy that favors settlements" and an "overriding public interest in settling and quieting litigation" particularly where class action litigation is concerned. *Class Plaintiffs v. Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992) (reversal of settlement approval only upon clear showing of abuse of discretion); *Bronkhorst v. Safeco Corp.*, 529 F.2d 943, 950 (9th Cir. 1976) (public interest in containing the burdens of expensive class-action litigation favors settlement); *Allen v. Bedolla*, 787 F.3d 1218, 1223 (9th Cir. 2015) ("there is a strong judicial policy that favors settlements, particularly where complex class action litigation is concerned.") (citation omitted).  In determining if a settlement meets Rule 23's final-approval standards, the district court must find that the settlement is "fair, reasonable, and adequate." Fed. Rule Civ. Proc. 23(e)(2).  There is an initial presumption of fairness when, as here, a proposed

---

[2] As previously noted, were the settlement not to received final approval of the Court. Amrock expressly reserves the right to challenge this expert's methodology, which it believes vastly overstates the value of the alleged claims.

[3] The release is limited to those claims certified for class treatment: (1) violation of California Labor Code § 2802, (2) violation of California Labor Code § 226, and (3) a derivative violation of California Business & Professions Code §§ 17200, *et seq.* (through violation of California Labor Code § 2802 and/or California Labor Code § 226). *See* Docket 154.

class settlement is negotiated at arm's length and presented for court approval. See Newberg and Conte, Newberg on Class Actions (4th ed. 2002) ("Newberg"), § 11:41, p. 90.

This determination to approve or reject a settlement is made in the "sound discretion of the trial court." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998). The function of final approval is merely "to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable[,] and adequate to all concerned." *Officers for Justice v. Civil Serv. Comm'n of City & Cty. of S.F.*, 688 F.2d 615, 625 (9th Cir. 1982). Accordingly, a district court should neither judge the merits of the claims in dispute, nor compare the proposed settlement "against a hypothetical or speculative measure of what might have been achieved by the negotiators." *Id.* "Ultimately, the district court's determination is nothing more than an amalgam of delicate balancing, gross approximations, and rough justice." *Id.* (internal quotation marks omitted). *See also In re Immune Response Sec. Litig.*, 497 F. Supp. 2d 1166, 1172 (S.D. Cal. 2007) ("[T]he settlement or fairness hearing is not to be turned into a trial or rehearsal for trial on the merits. Neither the trial court nor [the appellate court] is to reach any ultimate conclusions on the contested issues of fact and law which underlie the merits of the dispute, for it is the very uncertainty of outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlements.") (citation omitted).

In assessing a settlement, the district court considers a number of factors, including: "the strength of the plaintiff's case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement." *Id*. In addition, a settlement must not have been the product of collusion. Class Plaintiffs, supra, 955 F.2d at 1290. Here, these factors heavily weigh in favor of the Court's granting final approval of the settlement.

**A.      The Strength/Weakness of Plaintiff's Case.**

Assessing the strength of a plaintiff's case and its likelihood of recovery involves weighing the merits against the amount offered in settlement and the potential recovery.  *See* Newberg, *supra*, at §11:44, pp. 121-122.  It is not necessary, however, for the Court to "reach any ultimate conclusions on the contested issues of fact and law which underlie the merits of the dispute, for it is the very uncertainty of outcome in the litigation and avoidance of wasteful and expensive litigation that induce consensual settlements."  *Class Plaintiffs*, 955 F.2d. at 1291 (citing *Officers for Justice v. Civil Service Com.*, 866 F.2d 615, 625 (9th Cir. 1982)).  Where both sides face significant uncertainty, the attendant risks favor settlement.  *Hanlon,* 150 F.3d at 1026.

As the federal court held in *Browning v. Yahoo!, Inc.*, 2007 U.S. Dist. LEXIS 86266, at *30 (N.D. Cal. 2007) "In considering the strength of Plaintiff's case, legal uncertainties at the time of settlement - particularly those which go to fundamental legal issues - favor approval." *Id*. at *30. See also *Hopson v. Hanesbrands Inc.*, 2009 U.S. Dist. LEXIS 33900 at *19 (N.D. Cal. 2009) ("Plaintiffs may have a strong case, but the risks inherent in continued litigation are great. Defendants strongly deny liability for Plaintiffs' principal claim … [T]he gross settlement amount and the Class Members' expected net recovery, after fees and other costs are deducted, appear to be a reasonable compromise, in light of the risks of litigation."; granting final approval of a wage and hour class action). ).  As recognized in a federal decision approving settlement of a wage and hour class action:

> The potential complexity and possible duration of trial also weigh in favor of granting final approval. Plaintiffs acknowledge the difficulties of proving damages, recognize the uncertainty of outcome, and believe defendant would appeal in the event of adverse judgment. A post-judgment appeal would require many years to resolve and delay payment to class members. Plaintiffs believe the benefits of a guaranteed recovery today outweigh an uncertain future result. Accordingly, plaintiffs argue, and the Court agrees, the actual recovery confers substantial benefits on the class that outweigh the potential recovery through full adjudication.

*Barcia v. Contain-A-Way, Inc.*, 2009 U.S. Dist. LEXIS 17118, *9 (S .D .Cal. 2009).

JOINT MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT

DAL 80753068v4

To illustrate these considerations, below is a summary of each side's respective positions regarding the merits of Plaintiff's case so that the Court can evaluate the settlement with input from both sides.

1.    **Plaintiff's Evaluation of the Certified Claims (Amrock Does Not Join in this Section of the Brief)**

a.    *The Class Members incurred work related expenses for Amrock without reimbursement.*

California Labor Code § 2802 requires employers to indemnify their employees for all work-related expenses incurred by the employees in direct consequence of their duties or pursuant to the direction of their employers. *Tan v. GrubHub*, 171 F. Supp. 3d 998 (N.D. Cal. 2016). The employer's duty to indemnify its employees for these work-related expenses does not turn on whether the employee made a request for a reimbursement, but rather, on whether the employer knew or had reason to know that the employee incurred a reasonable expense; if it did, the employer must exercise due diligence to ensure that the employee was reimbursed. *Stuart v. RadioSchack Corp.*, 641 F. Supp. 2d 901 (N.D. Cal. 2009).

Plaintiff contends that Amrock required the Class Members to use their personal vehicles, home internet connection, and personal cell phones for work. First, the Job Description for the Staff Appraiser position specifically states that a cell phone is required to work for Amrock. (Doc. 112-14). However, prior to May of 2015, Amrock did not reimburse the Class Members for use of their personal cell phones for work. Only after that time did Amrock begin offering a monthly cell phone payment of $85.[4]

Similarly, Plaintiff contends that Internet access at home is a requirement to work for Amrock. The Job Description for Amrock specifically states that a "Home Office setup" with "internet access" is required to work for Amrock. Plaintiff contends that Internet access at home is needed to communicate with Amrock's MAC portal to submit completed appraisal reports, email their supervisors, and receive job assignments. (Doc. 112-3 at page 161, ln. 17 – 162, ln.

---

[4] This claim is limited to the time period prior to May 2015.

JOINT MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT
DAL 80753068v4

15).  Amrock did not reimburse any Class Member for using the Internet at home. (*Id*. at page 163, lns. 2-7).

Moreover, Plaintiff contends that the Class Members were required to have a driver's license and their own transportation to work for Amrock. (*See* Doc. 112-14).  Amrock's CEO testified that Class Members need transportation "to get to the properties and visit the comparable sales to perform their function." (Doc. 112-3 at page 170, ln. 24 – page 171, ln. 8).  Plaintiff contends that the Class Members had to drive as part of the appraisal process.  They "drive to homes to conduct inspections." (*Id*. at page 171, lns. 3-5).  They "drive to other comparable properties to take pictures." (*Id*. at page 171, lns. 6-8).  Unfortunately, Plaintiff contends that the Class Members do not get reimbursed for the expenses incurred for driving for Amrock. (Doc. 112-5 at page 211, ln. 19 – 212, ln. 16).

Plaintiff contends that the internal documents maintained by Amrock - the job description, job posting, and compensation plans – along with the deposition testimony of Amrock's employees proved that the Class Members were required to use their cell phone, home Internet connection, and personal vehicles for work.  With the exception of cell phone use (which Amrock began to provide a reimbursement after May 2015), Amrock did not provide a reimbursement for these work-related expenses.

Plaintiff firmly believes in the merits of his case because the Class Members did incur these expenses, Amrock had reason to know that they incurred these expenses, and Amrock did not reimburse them.

> **b.**    ***Plaintiff Contends that the wage statements issued by Amrock
> failed to comply with the California Labor Code.***

Employers must furnish accurate wage statements to employees, or else pay a penalty to the employee. Cal. Labor Code § 226(a).  Plaintiff contends that the wage statements issued by Amrock failed to comply with the law. *See* Cal. Labor Code § 226(a) (requiring "an accurate itemized statement in writing showing (1) gross wages earned, (2) total hours worked by the employee, except as provided in subdivision (j), (3) the number of piece-rate units earned and any applicable piece rate if the employee is paid on a piece-rate basis.")

First, Amrock did not issue one wage statement that identified the gross wages earned because Amrock's policy was to provide two wage statements, rather than one.  Amrock issued two wage statements, one for the salary compensation and the other for the production compensation incentive. (Doc. 112-3 at page 251, lns. 9-18).  As a result, Plaintiff contends that the wage statements for the same pay period had inconsistent and inaccurate information as to the gross wages earned. (*See* Doc. 112-16 at page TSI 601 identifying year to date gross wages as "$18,707.28" on pay date March 6, 2015 when TSI 602 identified year to date gross wages as "$17,622.28" on the same pay date of March 6, 2015).

Second, Plaintiff contends that the hours category was not accurate.  The wage statement for the salary portion of the pay listed 80 hours on nearly every record. (Doc. 112-3 at page 251, ln. 19 – 252, ln. 6; page 253, lns. 1-25).  Yet, Amrock admittedly did not keep track of the hours worked by the Class Members.  Worse, on the wage statement for the production compensation incentive, the number of hours listed is zero. (*See* 112-16 at page TSI 601 identifying 0 hours worked during the pay period of 2/16/2015 – 3/1/2015 and page TSI 602 listing 80 hours worked during the same pay period).  Plaintiff contends that it cannot be reasonably disputed that these wage statements are not accurate.

Although an employer is not required to record the number of hours worked on the wage statements for those employees who are exempt from overtime, Plaintiff contends that he was not exempt as a matter of law.  Plaintiff believes that this exemption issue can be resolved by answering one question -  whether the completion of appraisal reports constitutes work that is exempt from the overtime requirements.  Plaintiff believes that, in *McKeen-Chaplin v. Provident Savings Bank*, 862 F.3d 847 (9th Cir. 2017), the Ninth Circuit addressed a very similar question and held that this type of work does not constitute exempt work.

Moreover, Plaintiff believes that Amrock conceded in discovery that the Plaintiff and the Class Members were not exempt from overtime in 2016.  That is because Amrock failed to pay the minimum required salary to meet any of the "white collar" exemptions from overtime."Labor Code § 515(a) exempts from overtime compensation executive, administrative, and professional employees whose primary duties meet the test of exemption," and "*who earn a monthly salary at*

DAL 80753068v4

*least twice the state minimum wage for full-time employees*." *Moua v. Int'l Bus. Machines Corp.*, Case No. 5:10-cv-01070-EJD, 2017 WL 4355050, at *2 (N.D. Cal. Sept. 29, 2017) (emphasis added, citing *Harris v Super. Ct.*, 53 Cal. 4th 170, 178 (2011)). Further, 8 Cal. Code Regs. § 11040(A)(2)(g) and § 11040(A)(3)(d) state that for the administrative and learned professional exemptions to apply, the employee must "earn[] a monthly salary equivalent to no less than two (2) times the state minimum wage for full-time employment. Full-time employment is defined in Labor Code Section 515 (c) as 40 hours per week." *Id.*

To qualify for these exemptions from overtime, the employee must meet (1) the salary test, and (2) the duties test. *See id.* Both requirements must be satisfied and the employer bears the burden of proving both of them. *Bothell v. Phase Metrics, Inc.*, 299 F.3d 1120, 1124 (9th Cir. 2002); *Bratt v. Cty. of L.A.*, 912 F.2d 1066, 1068 (9th Cir. 1990). If the employee was not paid the minimum salary, then the duties test is irrelevant because the employee is not exempt as a matter of law. *See, e.g.*, *Moua v. Int'l Bus. Machines Corp.*, Case No. 5:10-cv-01070-EJD, 2017 WL 4355050, at *2 (N.D. Cal. Sept. 29, 2017).

Amrock's 30(b)(6) Representative agreed that both (1) the salary test and (2) the duties test must be satisfied in order for an employee to be classified as exempt. (Doc. 112-1 at page 176, ln. 24 to page 178, ln. 8) (emphasis added). Amrock further admitted that in 2016 it failed to pay Plaintiff and the Class Members the minimum salary necessary to qualify for these exemptions. (*Id.* at page 187, ln. 8 to 188, ln. 11). By failing to pay them the required salary, they were not exempt as a matter of law. (*See id.*) Given that the wage statements did not include the number of hours worked, they violated California law.

Third, the wage statement for the production compensation incentive did not provide any information to determine how those wages were calculated. The production compensation incentive pay was directly tied to the number of appraisals that were completed per pay period. The more appraisals completed meant more points awarded. More points, meant more money. Plaintiff contends that, under California law, the production compensation incentive constitutes a piece as a matter of law. The California Department of Industrial Relations identifies piece-rate

JOINT MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT

DAL 80753068v4

1    as "[w]ork paid for according to the number of units turned out." Here, the number of appraisals

2    that were completed determined the amount of the production compensation incentive pay.

3        Plaintiff contends that the wage statements did not comply with the law because there

4    was no information as to the number of appraisals completed during the pay period, the number

5    of appraisal points earned during the pay period, or the dollar value associated with each

6    completed appraisal – as required under Cal. Labor Code § 226(a)(3). (*See* Doc. 112-3 at page

7    254, ln. 4 – 255, ln. 14). Thus, according to Plaintiff, these wage statements, which were the

8    same for all Class Members, failed to comply with California law.

9        **2.    Amrock's Evaluation of the Certified Claims (Plaintiff Does Not Join**

10           **in this Section of the Brief)**

11           ***a.    The Internet and Cell Phone Reimbursement Claim.***

12        Plaintiff's reimbursement claims – for (i) internet expense (work, not personal), (ii) cell

13    phone usage (work, not personal), and (iii) travel expenses (work, not personal) – face major

14    hurdles. In each instance and for each class member, Plaintiff must prove the expense (a) was

15    incurred by the ESA, (b) was for business use and not a personal use, (c) was reasonable under

16    the circumstance, and (d) was necessary under the circumstance.[5]

17        As the Court observed when initially certifying these claims for class treatment:

18    "individualized questions of damages" may "ultimately render class resolution unmanageable,"

19    and "decertification of the class may be proper." (Dkt. 154, 4/2/18 order re class/FLSA

20    certification, at 6:17-18. Amrock believes the Court's hesitation to be well-founded. Plaintiff's

21    admitted inability to separate out his usage, much less his personal and business usage, very

22    likely would lead to manageability problems and, in turn, decertification.

23        As a starting point, internet and cell phone plans are routinely *shared* by users, who use

24

25

26    _____

27        [5] *See* Cal. Labor Code § 2802; *Marr v. Bank of Am.*, No. C 09-05978-WHA, 2011 WL
    845914, at *1 (N.D. Cal. Mar. 8, 2011) (citing *Gattuso v. Harte-Hanks Shoppers, Inc.*, 42 Cal.

28    4th 554, 568 (2007)).

"family" and other group plans.[6]  Further, even if one could isolate one user's usage (an ESA's usage) from another's usage (that of a family member or housemate), the question of *why* one of the users placed a call or used data – e.g., for personal use or a business use? – can be determined only by individual proof.  To quote Plaintiffs' expert: "it would be almost impossible to try and identify data usage prorations" between business and personal usage.  (Dkt. 126 (Ex. 11), Breshears Depo. at 171:8-173:7.)  Likewise, Plaintiff admitted that he could not do this, and that he would be "*guessing*" in trying to allocate between personal usage and business usage.  (Dkt. 126 (Ex. 10), Swamy Depo., 260:24-261:8, 257:9-16.)  Similarly, when asked via interrogatory to allocate his costs, he – with a month to answer and the assistance of counsel – could provide no answer.  (Dkt. 126 (Ex. 9), Plaintiff's discovery responses.)  Similarly, Plaintiff uses a shared internet plan, which each of the users also use for personal use, and Plaintiff could only "guess" at usage allocations.  (Dkt. 126 (Ex. 10), Swamy Depo., 247:19-248:2, 248:16-19, 419:23-420:7.)

Yet such prorations are precisely what the elements of Section 2802 – on which plaintiffs bear the burden of proof – require.  *Gattuso,* 42 Cal. 4th at 568 (allocations require "detailed record keeping by the employee" as well as "the exercise of judgment (by the employer, the employee, and officials charged with enforcement of section 2802) to determine whether the expenses incurred were reasonable and therefore necessary").  Plaintiff's counsel has stated that the only way to do so is through individualized "testimony from Staff Appraisers [regarding] . . . not being reimbursed for their work-related expenses" (Dkt. 109, Plaintiff's motion for class certification, at 6:25-26).  Apart from being quintessentially individualized, even the *named Plaintiff* could not do this, even with a month to do so and with the assistance of counsel.

Moreover, even *if* these manageability problems could have been solved, Plaintiffs' claim overlooks the fact that Amrock provides all ESAs with an iPad with a paid-for data plan and

---

[6] Dkt. 126 (Ex. 11), Breshears Depo., 162:12-163:6, 167:3-186:6, 190:5-23, 193:22-194:17; Dkt. 126 (Ex. E), Ferris Decl. ¶¶ 14-22; Dkt. 126 (Ex. G), Byrne Decl. ¶¶ 14-16; Dkt. 126 (Ex. H), Long Decl. ¶¶ 12-15; Dkt. 126 (Ex. F), Putnam Decl. ¶¶ 30-39.

camera.  (Dkt. 126 (Ex. 10), Swamy Depo., 249:11-250:15, 251:1-6;  Dkt. 126 (Ex. E), Ferris Decl. ¶ 20; Dkt. 126 (Ex. G), Byrne Decl. ¶ ; Dkt. 126 (Ex. H), Long Decl. ¶ 16; Dkt. 126 (Ex. F), Putnam Decl. ¶ 36.)  Amrock believes that this would effectively zero out the claim for reimbursement of internet expenses.

Ignoring the iPad altogether, Plaintiff's expert seeks to side-step these issues simply by making assumptions concerning each and every ESAs usage.  Specifically, Plaintiff's expert claims that the "the lowest cost" standalone monthly internet plan in California (though notably an unlimited plan, which is more expensive than a limited plan) is $35, and proposes to decree – without allocation, and without acknowledging the provided iPad – that each ESA has proven the elements of his/her claim and should recover that sum.  But this ignores that Plaintiff Swamy – like virtually everyone in modern America – bundles internet with a cell phone plan to reduce costs, and further reduces costs by using a household or family plan with multiple users. Moreover, Mr. Breshears apparently failed to analyze Plaintiff Swamy's own data plan which, combined for all its users (three persons) totaled just $30 per month in the last five months for which Swamy provided his bills, and was just $18 (combined for all three) in the month before that.  (See Dkt. 126 (Ex. 4), chart summarizing the Swamy household's internet bills; Dkt. 126 (Ex. 2), bills produced by Swamy.)  But even using $30 (not $18) as the "lowest" available household (three users) plan, and applying that amount across-the-board to all ESAs (to overlook the manageability problem and sidestep the elements of the claim), the amount in controversy would be very modest even making extremely conservative assumptions.

If, for example, we (i) assume the ESA used fully one half of the data on the shared plan, and (ii) assume that 75% of the data he/she uses is for a business (not personal) use, that would place in controversy $11.25 per month for each ESA ($30 x .5 x .75 = $11.25).  There are 50 months within the three-year limitations period running through the end of May 2018 (the date of the preliminary approval hearing).  During that period, there were 42.77 ESAs on average working during each month.  (Dkt. 163-4, Khan Decl. ¶ 2.)  Thus, the maximum exposure on this claim – even if it could be proven through assumption – is $24,058 ($11.25 x 50 x 42.77).  And even that

JOINT MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT

modest sum assumes a 100% chance of success on the merits, and a 100% chance that the Court would find that simply assuming plan and use rates, etc., is a permissible means to overcoming the manageability issue that the Court previously flagged (all while ignoring the provision of and iPad and data plan to each ESA). *But see In re Optical Disk Drive Antitrust Litig.*, 303 F.R.D. 311, 324 (N.D. Cal. 2014) (denying class certification because the "class-wide impact [was] still being assumed by the [plaintiff expert's] models, rather than demonstrated by the results"). If we use a mere 25% discount for each of these issues, this nets $12,029.

Concerning the cell phone claim, Plaintiff's expert simply chose a maximum amount available for reimbursement as stated by Amrock beginning in May 2015 ($85), and multiplied that by the months in question. But this figure in no way shows the amounts in cell phone usage that ESAs (i) actually, (ii) reasonably, and (iii) necessarily, (iv) incurred – the elements of a legal claim. Put another way, the fact that Amrock voluntarily chose this reimbursement ceiling does not render that rate legally required, much less actually and reasonably incurred by ESAs for business use.

Moreover, using the actual cell phone bills produced by Swamy in this action as typical and representative – as a means to overlook manageability problems – yields profoundly different results than those offered by Swamy's expert. The Swamy household's cell phone charge was $60 per month, plus approximately $20 in monthly fees and taxes, for a household total of $80 per month. (See Dkt. 126 (Ex. 4), chart summarizing the Swamy AT&T bills; Dkt. 126 (Ex. 2), bills produced by Swamy.) Of that, Swamy's phone line usage for calls averaged just 20.11% of the total minutes used, with his wife and daughter using the vast majority of the plan. (*Id.*) From there, even assuming that a generous 25% of his minutes spent on his cell phone each month was for a business purpose, this comes to $4.02 per month ($80 x 0.2011 x 0.25). There are 14 months within a three-year limitations period through the end of May 2015 (after which the class seeks no recovery). As discussed above, there were 42.77 ESAs on average working during this limitations period. (Dkt. 163-4, Khan Decl. ¶2.) Thus, the maximum exposure on this claim for a cell phone call plan is $2,408 ($4.27 x 14 x 42.77).

JOINT MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT

DAL 80753068v4

1    Again, even that modest sum assumes a 100% chance that each ESA will prevail in full on the

2    claim, and a 100% chance that the Court would find that simply "assuming" that every ESA had

3    exactly the same use rate and usage is a permissible method for overcoming the manageability

4    issue that the Court previously flagged (and it is not).  If, as before, we use a mere 25% discount

5    for each, and after taking into account the discounts above, Amrock contends that this nets

6    $1,204.

7                              **b.    The Vehicle Expense Claim.**

8            Plaintiff's vehicle expense claim also faces significant hurdles with respect to

9    manageability and the merits.  First, there is no evidence in the record to show that all California

10    appraisers (particularly persons in dense urban areas like San Francisco) used a vehicle for

11    business purposes.  As Plaintiff admits, moreover, virtually everyone – including Swamy – used

12    his/her vehicle for personal reasons.  (Dkt. 126 (Ex. 10), Swamy Depo.,, 242:2-12, 243:23-

13    244:3.)  Further, Plaintiff shared three luxury cars with his wife, and made no effort to track the

14    miles he drove, much less those used for work and those used for personal matters – or even

15    which car he used on any given day.  (*Id.*)  Expenses, or course, vary widely across different

16    types of vehicles, and many class members may prefer to use actual expenses rather than a

17    standard IRS rate, as Plaintiff proposes.[7]  Further, there is no one-size-fits-all answer to whether

18    any particular ESA's personal choices in this regard were "reasonable" and "necessary" for the

19    business task at hand.  Moreover, Swamy was provided and used reimbursement forms that

21            [7] *See e.g., Gattuso*, 42 Cal. 4th at 568 (cit. omitted) ("[A]n employee's choice of automobile
      will significantly affect the costs incurred. An employee who chooses an expensive model and
22    replaces it frequently will incur substantially greater depreciation costs than an employee who
      chooses a lower priced model and replaces it less frequently. Similarly, some vehicles use
23    substantially more fuel or require more frequent or more costly maintenance and repairs than
      others. The choice of vehicle will also affect insurance costs. Other employee choices, such as
24    the brand and grade of gasoline or tires and the shop performing maintenance and repairs, will
      also affect the actual costs. Thus, calculation of automobile expense reimbursement using the
25    actual expenses method requires not only detailed record keeping by the employee and complex
      allocation calculations, but also the exercise of judgment (by the employer, the employee, and
26    officials charged with enforcement of section 2802) to determine whether the expenses incurred
      were reasonable and therefore necessary.").

include a section for vehicle expenses, but never sought such reimbursement. (*Id.*, 245:23-246:11.) Finally, Amrock did provide additional compensation—in terms of points used to calculate incentive compensation—to reimburse ESAs for vehicle costs.

Particularly given these variances, Amrock contends that Plaintiff's mileage model could not ultimately withstand scrutiny if the case were to proceed on the merits, and this methodology thus would not be manageable. First, Plaintiff's mathematic computations of imagined daily miles – based on a fictional loop of destinations – are flawed because he has no means to identify the destinations that would go into a daily loop – namely the sites actually visited (regardless of the order) on any given daily drive (a necessary component to the loop calculations they would have Google maps run).[8] Plaintiff's expert simply relied on what Mr. Swamy told him he drove each day, as recorded in one of his logs (but not another handwritten log, which conflicts with the log used). Of course, determining whether other ESAs maintained such logs and whether those logs accurately recorded the dates of actual travel, would itself present enormous manageability problems. But even using Mr. Swamy as an example, Mr. Swamy maintained <u>two</u> sets of logs containing <u>conflicting</u> information on the destinations driven each day – sometimes by several days. (Dkt. 126 (Ex. B), Kemple Decl. ¶ 16; Dkt. 126 (Ex. 7), chart of discrepancies.) And remarkably, in choosing which of these sets of data he would use, Mr. Breshears (at the direction of Swamy's counsel) used the "appointment date" found in Dkt. 126 (Ex. 6), which likely records the date the appointment was set, while ignoring a separate handwritten log created by Swamy of the "inspection date" ("insp. date"). Worse, he ignored that these dates conflicted. (Dkt. 126 (Ex. 5),; Dkt. 126 (Ex. 11), Breshears Depo., 44:23-45:11, 64:14-17, 73:10-74:1, 76:8-20; Dkt. 126 (Ex. 7), chart of discrepancies.) In Mr. Breshears' words, "*[w]hether that appointment actually occurred has not been taken into account.*" (Dkt.

---

[8] Mr. Breshears concedes that he does not even know whether ESAs actually drove to, or were driven to, one inspection or another (Dkt. 126 (Ex. 11), Breshears Depo, 31:10-32:9), and conceded that he "cannot step into the shoes of each person on each individualized day." (*Id.*, 49:12-19, *see also* 58:3-59:15 (same). He concedes: "I can't tell you with any certainty whether – the exact route a person took on any given day." (*Id.*, 59:21-60:11.)

JOINT MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT
DAL 80753068v4

126 (Ex. 11), Breshears Depo., 68:5-20, 70:16-71:8 (emphasis added).)  Apart from the fact that all of this assumes fictional driving patterns and loops, even the destinations driven to and within the loop are not known – all of which undermines Mr. Breshears' conclusions.  (*Id*., 67:9-24, 69:18-70:1, 72:5-13.)

Second, this data is not known to be accurate for the additional reason that the starting point for any driving (supposedly measured by this model) is not known.  ESA routinely begin their day with personal matters – school activities, the gym, shopping, other recreation or errands – and therefore begin their commute to their first inspection, not from home, but from some other location.  This is not factored in to Plaintiff's model.  As the Court observed when initially certifying these claims for class treatment: "Should individualized questions of damages ultimately render class resolution unmanageable, however, decertification of the class may be proper." (Dkt. 154, 4/2/18 order, at 6:17-18.)   Again, Amrock believes such hesitation is well-founded.

Third, Plaintiff's model overstates the miles to which ESAs would be entitled, by assuming that ESAs are entitled to reimbursement for miles incurred driving from home (or the school where they dropped off their children) to the first stop of the day, and then from the last stop back home again – i.e., their <u>commute</u>.  However, commuting back and forth to work is not on an employer's dime.  To illustrate, in *Sullivan v. Kelly Services, Inc*., 2009 WL 3353300, *1 (N.D. Cal. Oct. 16, 2009), the issue was whether a temporary staffing agency was required to reimburse its employees expenses incurred in traveling to interviews.  The court found that "Plaintiff . . . was permitted to travel to and from work in her own vehicle and could effectively use [her] travel time for [her] own purposes." *Id.* at *5.  Therefore, the court dismissed the reimbursement claim on summary judgment because "these expenses were not incurred within the scope of her employment" and were not recoverable under Labor Code section 2802.  *Id.* at *7-*8.[9]  Indeed, the California Division of Labor Standards Enforcement ("DLSE") has opined

---

[9] *See also*, *Morillion v. Royal Packing Co*., 22 Cal. 4th 575, 586-88 (2000) (holding by California Supreme Court that "the time plaintiffs spent commuting from home to the departure

JOINT MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT

that if an employee is aware that the job site for his or her position is not fixed and has a reasonable expectation that he or she may need to travel reasonable distances to different job sites, then the employee's travel expenses are not compensable. *See* DLSE Op. Ltr. 2003.04.22.

Importantly, the commute miles that Mr. Breashears would have included in his proposed model – and which are not compensable – represent the vast majority of the miles on which his model seeks compensation. Once an ESA competes his/her commute to inspection site, Mr. Breshears concludes that ESA drove 2 additional miles from that start point to review each comparable properties. To simplify, analyzing all days on which Breshears concludes there was only a single inspection, reveals an average of 19.8 miles in commuting miles vs. an average of 2 miles for comps. (Dkt. 163-4, Khan Decl. ¶4.) In other words, for this set of the data, 90.8% of the miles would not be eligible for reimbursement. (*Id.*) Applying that percentage to the approximate $646,000 that Plaintiff claims are at issue, results in an actual valuation of this claims of just $59,432 (9.2% x $646,000). And again, even that figure ignores discounts for the significant possibility that (i) this Court will reject this "method" (flawed at many points) at trial, or (ii) find that the claim is not unmanageable or otherwise fails on the merits. If we apply only a 25% discount total for both considerations – though we believe this to be extremely conservative – and after taking into account the additional discounts discussed above, Amrock contends that this results in an amount in controversy of just $44,574.

### c.    The Wage Statement Claim.

Plaintiff claims that his wage statement violates Section 226 by alleging three purported deficiencies, each of which Amrock believes will either fail as a matter of law, or ultimately will not be tried on a class basis. Moreover, the claim places only a modest sum at issue.

First, Swamy falsely claims that he does not receive in each pay period a wage statement that sets forth his gross wage earned, a required by Labor Code section 226(a)(1). Amrock believes that this claim would have been disposed of on summary judgment. As with virtually

points and back again is not" reimbursable because such was part of a normal commute).

JOINT MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT

DAL 80753068v4

all employers who use incentive pay and bonus structures, Amrock calculates and processes salary wages separately from bonus wages. (Dkt. 112-17, sample ESA compensation plan.) Each pay period, it issues a wage statement showing the salary component of wages (which shows gross wages up to that point), and a wage statement that adds to the salary component additional sums earned in incentive pay. That second wage statement lists the total gross pay (to include both the salary component and the incentive payment), and accurately states the "gross pay" paid to the employee through that pay period. In other words, Amrock breaks out separately the salary component of wages paid, and the incentive payment component of wage paid, and then totals them and (completely accurately) lists the total payment to date (salary plus incentive pay) as "gross wages," exactly as required by Section 226(a)(1).[10]

Second, Swamy claims that he and other ESAs have actually entered into a "piece rate" agreement with Amrock, and that his wage statements fail to identify the number of piece-rate units earned, and the applicable piece rates as would be required pursuant to Section 226(a)(2). But ESAs are not compensated on a piece rate basis. Piece-rate compensation involves paying a flat rate for a certain unit produced where generally accepted databases of information correlate pieces/units to "labor hours."[11] Here, to prevail on this claim, Swamy would have to show with

---

[10] To illustrate, on March 6, 2015, Amrock first processed Swamy's salary payment of $1,536.46, which brought his YTD wages to $17,622.28. (Dkt. 112-16, Swamy wage statements, at TSI602.) It then processed his incentive bonus of $1,085.00 for the relevant pay period. (*Id.* at TSI601.) That brought his YTD wages up by the $1,085, resulting in a YTD total in the second statement of $18,707.28 (exactly $1,085 higher than $17,622.28).

[11] *See Sandoval v. M1 Auto Collisions Centers*, No. 13-cv-03230-EDL, 2016 WL 6561580, *2 n.4 (N.D. Cal. Sept. 23, 2016) ("A task's 'flag hours' are set by an estimating database that calculates the amount of time the average technician takes to complete the repair... These estimates, which are based on industry standards, are designed to take into account the amount of time that the average technician takes to complete the repair"); *Tokoshima v. The Pep Boys—Manny Moe & Jack of Cal.*, No. C-12-4810-CRB, 2014 WL 1677979, *1 (N.D. Cal. Apr. 28, 2014) ("piece rate system" involves payment at "a flat rate for each 'labor hour' that the mechanic accrues" where "a fixed number of 'labor hours' [is assigned] to every service or repair task a mechanic performs … derived from the Mitchell Guide—which is used throughout the industry and provides standard time estimates for every specific service task based on the particular year, make, and model of the vehicle—and are intended to correspond to the actual amount of time a mechanic should require to complete a task.") (cit. omit.).

common proof that there is (i) a single rate paid for each appraisal and (ii) that rate was correlated to a specific number of hours that it generally takes to perform some "typical" appraisal. Swamy has not proposed any evidence on this issue, let alone evidence that is common to the class. That is because he cannot. There is no "typical" appraisal; appraisals take varying lengths of time based on a host of variables related to the appraiser as well as the subject property. (Dkt. 126 (Ex. C), Phillips Decl., ¶¶ 10-44.) Indeed, Swamy confirmed as much at his deposition, testifying that the time it takes him to do appraisals varies by more than 300% across projects (Dkt. 126 (Ex. 10), Swamy Depo., 384:12-388:5). This variance was confirmed by Mike Brocker-Querio, Staff Appraiser Director for Amrock, who testified that the time required to perform any given appraisal can vary by almost 20-fold between one appraisal and the next. (Dkt. 126 (Ex. 12), Brocker-Querio Depo., 264:19-265:13.)

Moreover, unlike a "piece rate" compensation plan, the incentive pay received for any appraisal is based, not upon how long an appraisal took, but upon (i) a subjective evaluation of the complexity of the appraisal project, and (ii) how many other appraisals were completed in the same two-week period. (Dkt. 112-17, ESA compensation plan.) The bonus paid for any given appraisal can vary by as much as three-fold. (*Id.*) Even then, the bonus incentive awarded for any given appraisal may be *increased* by Amrock. There is no set "piece rate." This is a classic bonus structure.[12] Again, Amrock believes it would have obtained summary adjudication in its favor on this claim, but for this settlement.

Third, Swamy claims that his wage statements fail to record the hours he worked as is required for non-exempt employees pursuant to Section 226(a)(2). Though originally insisting otherwise, Swamy's counsel now concedes that such hours need not be reported unless the employee is exempt. As such, to maintain this claim, there would need to be a common classwide method to establish whether each ESA is exemption and, if Swamy prevailed on that

---

[12] *See* DLSE Manual § 2.5.5 ("bonus" includes "contractually required payment where a promise is made that a bonus will be paid in return for a specific result (i.e., exceeding a minimum sales or piece quota**)**"). As a bonus, it is "is properly determined by the … plans' specific terms." *Schachter v. Citigroup, Inc.*, 47 Cal. 4th 610, 621 (2009).

JOINT MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT

question as to each ESA, he would then need to establish the actual hours worked by each ESA in each pay period to establish a wage statement violation. Swamy can do neither.

Concerning exemption, Swamy has relied on *Boyd v. Bank of Am. Corp.*, 300 F.R.D. 431, 440 (C.D. Cal. 2014). But his reliance is misplaced. As this Court noted, in *Boyd* "[t]he parties *agree*[*d*] that Appraisers had only one duty: conducting appraisals and generating appraisal reports." *Boyd v. Bank of Am. Corp.*, 109 F.Supp.3d 1273, 1303 (C.D. Cal. 2015) (emph. added). The record evidence here, by contrast, demonstrates that Amrock and its customers rely on ESAs for far more than appraisal work to guide their business decisions. ESAs are unique in that they assist the business in charting its course in other ways. They function as experimenters from which Amrock learns how the business could be improved, develop better processes, better technology, develop a better understanding of how to find efficiencies within the process, and how to improve upon the client service experience. They assist in software design and testing, review protocols of outside, non-employee appraisers, and participate in pilot programs, beta testing, and the development of propriety software. As this Court noted, "these differences [in the duties at issue in *Boyd*] may be relevant to the determination of whether class members were properly classified as exempt." (*See* Dkt. 154, 4/2/18 order, at 8:15-16.)

Importantly, Amrock's ESAs also perform these various tasks in <u>varying</u> degrees. Having noted that these unique duties may render these persons exempt, the Court went on to state that "these additional duties and responsibilities were uniformly imposed on members of the putative class," and on that basis determined that such additional duties therefore "do not render class certification inappropriate." (Dkt. 154, 4/2/18 order, at 8:10-17.) Respectfully, Amrock submits that the Court was mistaken here. Indeed, it is undisputed that ESAs perform these varying duties in *varying* degrees.[13] As noted, some ESAs go weeks or months without

---

[13] Dkt. 126 (Ex. 14), Petkovski 30(b)(6) Depo., at 64:12-15; Dkt. 126 (Ex. 12), Brocker-Querio Depo., at 289:3-21 (software design and testing), 198:198:18-21 (reviewing protocols of other appraisers), 200:10-201:1 (same), 205:8-206:10 (beta testing); Dkt. 126 (Ex. E), Ferris Decl. ¶ 7; Dkt. 126 (Ex. G), Byrne Decl. ¶¶ 6-7; Dkt. 126 (Ex. H), Long Decl. ¶ 6; Dkt. 126 (Ex. F), Putnam Decl. ¶¶ 12-13.

JOINT MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT

doing appraisals, and instead work on special projects, such as beta testing. Other ESAs, like Swamy if his testimony is to be credited, did nothing other than appraisals – a perfect inverse. And the vast majority of ESAs do a combination of these special projects – software design and testing, protocol reviews of other appraisers, pilot programs, beta testing, development of software etc. – in varying degrees. Still other ESAs serve in a supervisory capacity, while others do not. Further, Amrock also believes that even ESAs appraisal activities (which vary between ESAs) are exempt, particularly given the use made of them by Amrock and its customer.[14] Given this variance, a court evaluating the applicability of an exemption "must conduct an individualized analysis of the way each employee actually spends his or her time, and not simply review the employer's job description." *Vinole v. Countrywide Home Loans, Inc*., 571 F.3d 935, 945 (9th Cir. 2009). In short, apart from these activities rendering ESAs to be exempt, were this case to proceed to trial, Amrock believes that the facts would show that an absence of uniformity in the variety and degree to which they are performed, and that there is a significant chance that the Court would find that this claim is unmanageable.

Setting aside the exemption question, Amrock believes it would prevail on this claim in any event, as Swamy cannot establish the actual hours that ESAs worked, which hours he claims should have been listed on the wage statements. (See e.g., Dkt. 154, at pp. 9-12.) As a result, Swamy cannot show that the wage statements are inaccurate as to himself in any particular two-week pay period, much less inaccurate for all California ESAs in all pay periods.

---

[14] ESAs provide expert opinions of value, based on highly discretionary and inherently intellectual processes requiring application of skill, judgment and experience. (Dkt. 126 (Ex. C), Phillips Decl. ¶¶ 11-44.) Given this discretion, and the wide variety of factors and activities that relate to appraising divergent properties for divergent purposes, appraisal values vary. Further, Amrock's primary customers, base their business decisions of whether to offer home loans to end customers and, if so, on what terms, and in what markets, on the expert valuation services provided by ESAs. These facts also support the conclusion that Amrock's ESAs are, in fact, exempt. *See* Wage Order 4 (found at Cal. Code Regs. tit. 8, § 11040) ("(2) Administrative Exemption. A person employed in an administrative capacity means any employee: (a) Whose duties and responsibilities involve…: (i) The performance of office or non-manual work directly related to management policies or *general business operations of his/her employer or his/her employer's customers*") (emph. added).

DAL 80753068v4

Moreover, each of these theories under Labor Code section 226 is defeated if Amrock acted in <u>good faith</u> (even though in technical non-compliance). To establish a claim under Section 226, claimants must prove that the defendant "knowing[ly]" and "intentional[ly]" violated section 226. *Amaral v. Cintas Corp. No. 2*, 163 Cal.App.4th 1157, 1195 (2008) (inadvertent on-compliance is not actionable). If the employer had a "<u>good faith</u>" belief that it was not required to report an item in question, or reported it as required, then there could be no liability under Section 226.[15] Importantly, *"[t]he fact that a defense is ultimately unsuccessful will not preclude a finding that a good faith dispute did exist.*" 8 Cal. Code Regs. § 13520 (2006) (emphasis added.) Further, "penalties can only be recovered under Labor Code … 226(e) for knowing, intentional, and willful violations, *not mere recklessness.*" *Pedroza,* 2012 WL 9506073, *5 (emphasis added).

At minimum, Amrock believes that it would have been found to have acted in good faith in connection with the Section 226 theories advanced by Plaintiff. *See Pedroza,* 2012 WL 9506073, *5 ("PetSmart has certainly presented a defense—the executive exemption affirmative defense—that, if successful, will preclude Plaintiff from recovering. Further, this defense is reasonable, supported by evidence, and Plaintiff presents no evidence that it has been presented in bad faith. That PetSmart has not met the high burden on summary judgment in demonstrating that the exemption applies to Plaintiff does not mean that the Parties' dispute about Plaintiff's exempt status is not a "good faith dispute."). For this reason too, Amrock believes Plaintiffs Section 226 claim would fail as a matter of law at trial of on summary judgment, but for this settlement.

Moreover, the amount in controversy on this claim is modest. At most class members

---

[15] *See Pedroza v. PetSmart, Inc.,* 2012 WL 9506073, *4-6 (C.D. Cal. 6/14/12) ("PetSmart argues that it is entitled to summary judgment on these claims because a 'good faith dispute' exists regarding whether Plaintiff was misclassified, and thus, as a matter of law, it could not have acted knowingly, intentionally, or willfully. We agree. The good faith defense to the willfulness element of these sections [Labor Code section 226 and 203] is clearly established under California law."); *Aguilar v. Zep Inc.,* 2014 WL 4245988, *19 (N.D. Cal. 8/27/14) (same).

could recover (i) $50[16] (ii) per participating ESA (iii) per pay period (iv) within the one-year limitations period.  There are 58 pay periods within the limitations period through the end of this month.  As Plaintiff concedes, this claim would create a maximum exposure of $124,000.  But again, that sum must be discounted for the points made above.  Again, assigning only very conservative 25% discounts for these considerations yields the following: 25% chance of decertification for unmanageability = $90,000 (.75 x $124,000); 25% chance that these claims will fail on the merits = $67,500 (.75 x $90,000); 50% chance that Amrock can establish that it acted correctly or at least in good faith on these issues = $33,750 (.5 x $67,500).  Thus, applying even very conservative discounts, Amrock believes that Plaintiff's class wage statement claim – after accounting for these discounts – pencils out to a "value" of about $33,750.  But to be clear, we believe that Amrock's chance of success on each point is greater than stated above.

* * *

As discussed above, in Amrock's view, the combined amount in controversy on these claims – *after taking into account these conservative discounts* – is calculated as approximately $92,000, as follows: internet data plan ($12,000); cell phone ($1,200); vehicle expenses ($45,000); wage statements ($333,750).  And even absent these discounts, Amrock believes that these claims would be worth substantially less than the $600,000 settlement – a sum it is willing to pay to its well-respected ESAs, to avoid still greater litigation costs.

Though Plaintiff and his counsel do not agree with these contentions, they recognize that these arguments pose significant risk to their claims at and before trial and, for these reasons too, believe the settlement to be an excellent settlement for the class, and certainly a fair and reasonable settlement for the class.

---

[16] Because Amrock has not been cited for a wage statement violation, the $50 penalty threshold applies.  *Amalgamated Transit Un. Local 1309, AFL-CIO v. Laidlaw Transit Servs., Inc.,* 2009 WL 2448430 *1,9 (S.D. Cal. 2009); *Amaral v. Cintas Corp. No 2*, 163 Cal.App.4th 1157, 1209 (2008*; Willis v. Xerox Bus. Servs., LLC*, 2013 WL 6053831 *1, 6 (E.D. Cal. 2013).

1    **B.    The Risk, Expense, Complexity, and Likely Duration of Further Litigation.**

2         "Additional elements that should be considered by the court in determining the

3    appropriateness of settlement are the likely expenses of continuing the litigation and its prospects

4    for relief for the class." *See* Newberg, *supra*, at § 11:50, p. 155.  "[U]nless the settlement is

5    clearly inadequate, its acceptance and approval are preferable to lengthy and expensive litigation

6    with uncertain results."  *Nat'l Rural Telcomms. Coop. v. DIRECTV, Inc*., 221 F.R.D. 523, 526

7    (C.D. Cal. 2004) (internal quotations omitted). The law favors settlement, particularly in class

8    actions and other complex cases where substantial judicial resources can be conserved by

9    avoiding formal litigation.  See Newberg, *supra,* at § 11:41, p. 87.  The uncertainty of outcome,

10   difficulties of proof, and length of litigation of class action suits lend them readily to compromise

11   and settlement.  *Id*. at § 11:41, 87-88.  But for this settlement, Plaintiff and the Class would

12   expend significant fees and costs, and risk (as discussed above), seeking to take this action to

13   trial.  Indeed, even if they prevailed at trial, and on any subsequent appeal, any damage/penalty

14   recovery would be dwarfed by the fees and costs expended to obtain it.

15   **C.    Plaintiff's View of the Amount Offered in Settlement.**

16        As detailed above, the settlement pays very significant dollars to class members, on

17   highly disputed claims.  This represents a more than equitable resolution of this case.  *See*

18   *Rodriguez v. West Publ'g Corp*., 2007 U.S. Dist. LEXIS 74767, at *30 (C.D. Cal. filed Sept. 10,

19   2007) (noting that a "'settlement amount representing 33% of the maximum possible recovery

20   was well within a reasonable range when compared with recovery percentages in other class

21   action settlements'") (quoting *In re Warfarin Sodium Antitrust Litig*., 212 F.R.D. 231, 257–58

22   (D. Del. 2002)), *rev'd in part on other grounds*, 563 F.3d 948 (9th Cir. 2009).  Further, Plaintiff

23   points to a 2015 study of trends in wage and hour settlements compiled by NERA found that the

24   overall median per-plaintiff settlement value in wage-and-hour cases from 2007 to 2015 was

25   $2,576. (*See* Dkt. 170-3 at pages 5 and 6). Though each case is different, the per capita recovery

26   here is greater than the average as stated in that study.  *See also Bower v. Cycle Gear, Inc*, 2016

27   WL 4439875, at *7 (N.D. Cal. Aug. 23, 2016) (reasoning that "the results obtained for the Class

28   Members were very favorable" where the average recovery was $183.70); *Ontiveros v. Zamora*,

JOINT MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT

DAL 80753068v4

2014 WL 3057506, at *14 (E.D. Cal. July 7, 2014) (observing that average recovery of $6,000 was "a generous amount" for a wage and hour case case, and collecting cases approving far lower per-class member averages); *Adoma v. Univ. of Phoenix, Inc.*, 913 F. Supp. 2d 964, 982 (E.D. Cal. 2012) (reasoning that average recovery of over $2,000 per Plaintiff was a "favorable" result).  Consequently, this factor weighs as well in favor of approval.

### D.    The Extent of Discovery and the Stage of the Proceedings.

Since the inception of this case, the Parties have engaged in extensive merits-based and class discovery. Both Parties served initial disclosures, document requests and interrogatories. Specifically, (i) the parties have conducted 11 depositions across 3 states, (ii) Plaintiff has propounded 27 interrogatories, 32 requests for admission, and 70 requests for production, and produced approximately 2,000 pages of records; and (iii) Amrock has propounded 51 requests for production and 12 interrogatories and produced over 52,000 pages of documents, which includes both traditional and electronic discovery.  (Dkt. 163-1; Foty Decl., ¶3.)  In advance of the mediation, Amrock also produced anonymized data for the entire class, which Plaintiff's expert (David Breshears) analyzed to estimate potential recoveries on the certified claims using Plaintiff's proposed methodology.  The parties also engaged and deposed experts:  Plaintiff's damages expert, David Breshears (a certified public accountant in California), and Amrock's appraisal industry expert, Trevor Phillips.

Without question, the extensive analysis of Plaintiffs' claims in connection with these matters, coupled with the additional data provided to Plaintiffs in connection with mediation, allowed them "to make an informed decision about settlement." *Williams v. Centerplate, Inc.*, 2013 U.S. Dist. LEXIS 121307, at *14 (S.D. Cal. filed Aug. 26, 2013).  This "weigh[s] heavily in favor of granting . . . approval." *Id.* at *15.

### E.    The Experience and Views of Counsel.

"With regard to class action settlements, the opinions of counsel should be given considerable weight both because of counsel's familiarity with this litigation and previous experience with cases." *West v. Circle K Stores, Inc.*, 2006 U.S. Dist. LEXIS 76558, *17-18 (E.D. C.A. 2006). Here, all counsel are of the opinion that the Settlement Agreement represents a

JOINT MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT

good compromise for the Class, given the inherent risks, hazards, and expenses of carrying the Action through trial. (Dkt. 163-1, Foty Decl. ¶4.) This weighs strongly in favor of approving the settlement. *See Rodriguez*, 2007 U.S. Dist. LEXIS 74767, at *31 ("[T]he trial court is entitled to, and should, rely upon the judgment of experienced counsel for the parties.").

### F.    The Reaction of the Class Members to the Proposed Settlement.

Federal courts have made clear that the number or percentage of class members who object is a factor of great significance. *See Mandujano v. Basic Vegetable Prods., Inc.*, 541 F.2d 832, 837 (9th Cir. 1976); *see also In re Am. Bank Note Holographics, Inc.*, 127 F.Supp.2d 418, 425 (S.D.N.Y. 2001) ("[i]t is well settled that the reaction of the class to the settlement is perhaps the most significant factor to be weighed in considering its adequacy") (int. quot., cit. omitted).

Here, <u>none</u> of the 50 members of the class have objected to the settlement. (Butler Decl. ¶¶6-8, 13). The absence of any objector strongly supports the fairness, reasonableness and adequacy of the Settlement. *See In re Austrian & German Bank Holocaust Litigation*, 80 F. Supp. 2d 164, 175 (S.D.N.Y. 2000) ("If only a small number of objections are received, that fact can be viewed as indicative of the adequacy of the settlement."); *Stoetzner v. U.S. Steel Corp.*, 897 F.2d 115, 118-19 (3d. Cir. 1990) (that only 29 of 281 member class members (10%) objected to the settlement "strongly favors settlement"); *Laskey v. Int'l Union*, 638 F.2d 954 (6th Cir. 1981) (that only 7 out of 109 class members (6.4%) objected to the proposed settlement should be considered when determining fairness of settlement). Further, after dissemination of the Notice to the members of the Settlement Class, which provided each class member with the terms of the settlement, including the specific payment amount to that employee, five persons chose to opt-out of the Settlement, which correlates to 10% of the Settlement Class. (Butler Decl. ¶¶6-8, 12). This factor too strongly supports final approval of this Settlement.

### G.    Arm's-Length Negotiation and Settlement.

Courts respect the integrity of counsel and presume the absence of fraud or collusion in the negotiation of settlements, unless there is evidence to the contrary. See Newberg, *supra*, at § 11:51, p. 158. Where there has been an arm's length negotiation – particularly with the

assistance of an experienced mediator – there is "every reason to conclude that settlement negotiations were vigorously conducted at arms' length and without any suggestion of undue influence." *In re Wash. Public Power Supply System Sec. Litig.*, 720 F. Supp.1379, 1392 (D.Ariz. 1989); *Alberto v. GMRI, Inc.*, 252 F.R.D. 652, 666 (E.D .Cal. Jun 24, 2008); *Glass v. UBS Fin. Servs.*, 2007 U.S. Dist. LEXIS 8476 (N.D. Cal. Jan. 26, 2007); 15 Wage & Hour Cas. 2d (BNA) 1330, at *15 (N.D. Cal. 2007) ("The settlement was negotiated and approved by experienced counsel on both sides of the litigation, with the assistance of a well-respected mediator with substantial experience in employment litigation [and] this factor supports approval of the settlement.").

Here, both sides heeded the Court's advice that "it is better to develop and to present a proposed compromise *after* class certification, *after* diligent discovery on the merits, and *after* the damage study has been finalized." (ECF No. 27 ("Notice Regarding Factors to Be Evaluated For Any Proposed Class Settlement"), § 10 (emphasis in original).)  Specifically, the Parties did not exchange any settlement demands until after the Court ruled on motions to dismiss, two motions for conditional certification under the FLSA, Plaintiff's motion for class certification under Rule 23, and two experts were deposed.  By that point in time, the record had been well-developed through fact and expert discovery.  (Dkt. 163-1, Foty Decl. ¶3.)

The proposed Settlement here is the product of extensive, arm's-length negotiations, which included an all-day mediation session with David Rotman -- a private mediator experienced in class action matters, which commenced only after the Parties had the benefit of the Court's Class Certification rulings. (*Id.*)  Counsel were thus able to make informed assessments regarding the merits of their claims and defenses. *See In re Charles Schwab Corp. Sec. Litig.*, No. C 08-01510 WHA, 2011 WL 1481424, at *5 (N.D. Cal. Apr. 19, 2011) ("the class settlements were reached on the eve of trial when class counsel had completed discovery and had conducted extensive motion practice and were thus well aware of the issues and attendant risks involved in going to trial as well as the adequacy of the amount of the class settlement."). The negotiations were informed by the knowledge Class Counsel gained through

JOINT MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT

discovery, with the aid of a certified public accountant who calculated an estimate of the amounts owed, as well as the rulings in this litigation. Based on their familiarity with the factual and legal issues, and armed with a thorough understanding of the strength and weaknesses of the claims at issue, the Parties were able to negotiate a fair settlement, taking into account the costs and risks of continued litigation. The negotiations were at all times hard-fought and have produced a result that the Parties believe to be in their respective interests.  (Dkt. 163-1, Foty Decl. ¶3.)  In fact, when it appeared that the Parties were unable to reach an agreement, Mr. Rotman made a mediator's proposal, which both sides accepted.  (*Id.*)  *See, e.g.*, *Zynga, Inc.* Sec. Litig., 2015 WL 6471171, at *9 (N.D. Cal. Oct. 27, 2015) ("The use of a mediator and the presence of discovery 'support the conclusion that the Plaintiff was appropriately informed in negotiating a settlement.'").

Class Counsel have carefully evaluated the merits of their case, concluding that they have a strong case and that there is sufficient evidence to proceed to the jury. Class Counsel, however, recognize that there exist challenges in this litigation that could pose significant risks regarding their ability to prevail and the scope of damages if the case were to proceed to trial, and thereafter, an appeal before the Ninth Circuit. Even if Plaintiff emerged victorious after appeal, there can be no doubt that the appeal would be lengthy and costly for all sides. *Charles Schwab Corp. Sec. Litig.*, 2011 WL 1481424, *5 (approving settlement; "prosecuting these claims through trial and subsequent appeals would have involved significant risk, expense, and delay to any potential recovery"). As such, Class Counsel believes the Settlement is fair, reasonable and adequate, and in the best interest of the Class. (*See* Dkt. 163-1, Foty Decl. ¶4.) *See In re NVIDIA Corp. Derivative Litig.*, No. C-06-06110-SBA (JCS), 2008 WL 5382544, at *4 (N.D. Cal. Dec. 22, 2008) ("[S]ignificant weight should be attributed to counsel's belief that settlement is in the best interest of those affected by the settlement."); *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1043 (N.D. Cal. 2008) (counsel's recommendation weighed in favor of settlement, given counsel's familiarity with the dispute and significant experience in securities litigation).

DAL 80753068v4

**H.      The Settlement Satisfies This Court's Other Criteria Regarding Settlements.**

The Parties' proposed settlement agreement also complies with the factors listed in this Court's Notice on Class Settlement Factors and the Procedural Guidance for Class Action Settlements in this District (the "Procedural Guidance"). Most importantly, the Settlement was reached after the Class Certification Order, with the same Plaintiff on behalf of the same classes as certified by the Court.  Second, The Settlement "does not improperly grant preferential treatment to the [Plaintiff] or segments of the class." *In Re Portal Software, Inc. Sec. Litit.*, 2007 WL 1991529, at *5 (N.D. Cal. June 30, 2007). Plaintiff will be receiving his proportionate share of the Class Damages according the same formula is the rest of the Class Members.  *See In Re NASDAQ Market-Makers Antitrust Litig.*, 176 F.R.D. 99 at 102 (S.D.N.Y. 1997) (settlement may be approved preliminarily where it does not improperly grant preferential treatment to class representatives or segments of the class").  While the Settlement anticipates the possibility that Class Counsel will apply for a service award for Plaintiff, the Settlement is in no way conditioned on receiving this award.  Third, "the scope of the class settlement release of claims is reasonable and sufficiently limited." *Charles Schwab Corp. Secs. Litig.*, 2011 WL 1481424, at *6. Consistent with the Notice on Class Settlement Factors, the Settlement releases only those claims certified in this action. Fourth, there is also no reverter to Amrock for settlement payments to settlement Class Members that go uncashed.  Fifth, participation is automatic for everyone who does not opt-out; there are no claim procedures – onerous or otherwise.

/ / /

JOINT MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT

DAL 80753068v4

1

## VI.   CONCLUSION

2

For the aforementioned reasons, the Parties' Settlement Agreement meets the Rule 23

3

requirements.  Consequently, the Parties respectfully request that this Court issue an Order

4

granting final approval of the class settlement in this Action.

5

Respectfully submitted,

6

Dated:  July 24, 2018                    KENNEDY HODGES, LLP

7

By:  _____/s/ Don Foty_____

8

Don Foty
Attorneys for Plaintiff and the Class

9

10

Dated:  July 24, 2018                    GREENBERG TRAURIG, LLP

11

By:  _____/s/Mark D. Kemple_____

12

Mark D. Kemple
Attorneys for Defendant Amrock Inc.
(f/k/a Title Source, Inc.)

13

14

\*          \*          \*

15

## **ATTESTATION**

16

I, Mark D. Kemple, am the ECF User whose ID and password are being used to file this

17

stipulation and proposed order. In compliance with Civil Local Rule 5-1(i)(3), I hereby attest that

18

attorney Don Foty concurred in this filing.

19

By:  _____/s/ Mark D. Kemple_____

20

Mark D. Kemple

21

22

23

24

25

26

27

28

JOINT MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT
DAL 80753068v4